¶ 1. Glenn Chapman, the life tenant on two parcels of timber property, appeals the judgment of the chancery court denying his request for "estovers," for appointment of a timber consultant or forester to manage the two parcels, for designation of trees planted by him as his personal property, and for allowing the two parcels to be cleared for either land farming or cattle raising. He also finds error in the remainderman's being made to pay the real property taxes. We find no error and affirm.
 STATEMENT OF FACTS ¶ 2. Glenn Chapman and John Alex Thornhill are not especially close first cousins. They are a litigious pair, though, having had two matters in which they were adverse parties previously decided by this Court. See Thornhill v. Chapman, 748 So.2d 819 (Miss.Ct.App. 1999) andTwin States Land Timber Co., Inc. v. Chapman, 750 So.2d 567
(Miss.Ct.App. 1999).
 ¶ 3. Thornhill granted Chapman a life estate in two parcels of property: a 76 acre parcel in 1988, and a 120 acre parcel in 1990. Thornhill testified that he now regrets having done so. Located on the 120 acre parcel was a house which Chapman occupied, but it was destroyed by fire in 1996. Chapman initially filed an action *Page 151 
against International Paper Company in chancery court alleging negligence for the fire. Out of that and related litigation grew his first claims against Thornhill. The chancellor ordered that these claims about permissible use of the timber on Chapman's property be brought as a separate civil action.
 ¶ 4. No new complaint was filed, but Chapman's suit was supported by his "motion to establish estovers and for declaratory judgment." Chapman requested that all pine trees planted on the 76 acre and 120 acre parcels be declared his sole personal property, and that he be declared entitled to estovers from the parcels. Chapman alleged that he required estovers for "food, clothing, and the essentials of life", and the payment for taxes. His requirements amounted to the sum of $10,000 per year. Chapman sought appointment of a timber consultant to "develop a management plan for these properties, which would be of the most benefit for the estate and provide the life tenant with the essentials of life which he is entitled." Chapman amended his motion to request in the alternative that timber be cleared from the two parcels of property for the purposes of making them suitable for farming or raising cattle. Chapman filed a second amendment alleging additional grounds for why he should be allowed to cut timber.
 ¶ 5. A one day trial was held. Both Chapman and Thornhill testified and each presented his own timber consultant. Chapman testified that he lived on the 76 acre parcel. It contained "a pine plantation, two pine plantations of different ages and mixed with approximately 40 acres." Chapman said that he had planted 11,000 pine trees on a portion of the 76 acre tract in 1991 and 18,000 pine trees on the open areas and open fields within the 120 acre parcel. No one assisted him in this.
 ¶ 6. Chapman further testified that since the inception of his life estate he had paid between $3500 and $3600 in property taxes. In 1990 Chapman and Thornhill sold all the merchantable timber located on part of the 120 acre parcel. Chapman testified that a portion of the parcel was clear-cut. Chapman also introduced timber deeds between Thornhill's predecessors-in-interest and other logging companies. Other than one timber sale in 1994 which produced $2,000, Chapman testified that he had not received any other income from either parcel.
 ¶ 7. Chapman then testified as to his need for money. He had spent all of the $21,000 awarded him in previous litigation against Thornhill, which dealt with the division of a certificate of deposit owned jointly by Chapman and Thornhill. Thornhill v. Chapman, 748 So.2d 819
(Miss.Ct.App. 1999). His monthly expenses amounted to $1048. A monthly payment of $500 was for a personal loan on which a balance of $3500 remained. His current monthly income was only $948. Chapman testified that the real property taxes on the two parcels averaged seven dollars per month.
 ¶ 8. What Chapman in part sought was the right to cut timber under the common law doctrine that provides for estovers. More will appear as to that principle later, but for now we will explain that estovers have had a varied meaning beginning with the importation of the common law into this country. Recognized in Mississippi is a right for a life tenant to cut such timber from the property as is needed for fencing, construction of other necessary structures, and for fuel. Hood v.Foster, 194 Miss. 812, 818, 13 So.2d 652, 653 (1943). Chapman argued that he should be allowed to cut such timber as was needed to meet his monthly expenses and repay his debts. Chapman testified *Page 152 
that harvesting timber worth $10,000 per year would be adequate. The extra income would be used to buy a vehicle and to move out of his house trailer. In sum, the funds from harvesting the timber would provide Chapman with his essential needs and his current income could be diverted to provide for a higher standard of living.
 ¶ 9. Chapman also wanted the chancery court to establish a management plan for the two parcels. Chapman had not discussed with Thornhill how the two tracts of land were to be used, but he believed that the best use was for tree farming. No livestock was on the two parcels of timberland.
 ¶ 10. Thornhill testified that he offered to pay the property taxes on both parcels of property, thereby reducing Chapman's financial needs arising from the property. When Thornhill purchased the two parcels, his purpose "was investment and something to leave my heirs." In addition to those purposes, Thornhill intended to use the properties for "timber." Thornhill testified that he only agreed to the one timber sale that had occurred because Chapman "kept bothering me to sell it." After that sale, Thornhill testified that Chapman "cleared it and set it out in seedling, pine seedlings." Thornhill testified that he and Chapman had no "understanding" with one another concerning the pine seedlings that Chapman planted.
 ¶ 11. Thornhill insisted that he did not want any of the trees cut. It was his belief that harvesting timber to provide Chapman with estovers was unnecessary because he was willing to reimburse Chapman for the property taxes. Further, no improvements were needed on the property.
 ¶ 12. Thornhill agreed that the only tree planting had been conducted by Chapman, except for a few that Thornhill planted shortly after purchasing the property. Thornhill's timber consultant agreed with Chapman's consultant that the landowner's objective was a primary consideration in constructing a timber management plan. Therefore, whether trees should periodically be cut to maximize growth was not a forestry issue, just a personal preference by the owner.
 ¶ 13. The chancellor found that Chapman was not entitled to cut timber as he proposed. The only relief that he granted, and it is relief that Chapman here attempts to reverse, was to require Thornhill to pay the property taxes.
 DISCUSSION 1. Declaratory Judgment ¶ 14. The rules of civil procedure state that "[c]ourts of record within their respective jurisdictions may declare rights, status, and other legal relations regardless of whether further relief is or could be claimed." M.R.C.P. 57(a). On the other hand, a declaratory judgment may properly be denied "where such judgment, if entered, would not terminate the uncertainty or controversy giving rise to the proceeding." Id.
 ¶ 15. The question here is whether Chapman is seeking a declaratory judgment or just an advisory opinion. It is proper to declare the rights of the parties if the case involves "an actual controversy that has not reached the stage at which either party may seek a coercive remedy, or in which the party entitled to such a remedy fails to sue for it." M.R.C.P. 57 cmt. These are the considerations for granting judgment: "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." M.R.C.P. 57 cmt. *Page 153 
 ¶ 16. Here, the disagreement between the parties about the extent of the life tenant's right to cut the timber has been recurring and litigated. That certainly makes Rule 57 attractive since "one or more legal issues vital to the controversy is susceptible of authoritative resolution." Johnson v. Hinds County, 524 So.2d 947, 954 (Miss. 1988). The Fifth Circuit Court of Appeals has stated that a declaratory judgment "is particularly well suited for situations that have evolved to a point of inevitable or imminent litigation." Armco, Inc. v. Southern Rock,Inc., 778 F.2d 1134, 1138 (5th Cir. 1985); Stringfellow v. Stringfellow,451 So.2d 219, 221 (Miss. 1984) (we will consider federal rule interpretations when assessing the meaning of a similar state procedural rule).
 ¶ 17. Considering the history of litigation between these two parties, it appears certain that further litigation would be inevitable. Whether Chapman is correct that what he is going to do is covered by the right of the life tenant to estovers is determinative. The resolution of that issue would "afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." We find that a declaratory judgment is appropriate.
 2. Estovers ¶ 18. Chapman argues that he, as the life tenant, should be allowed to harvest timber in order to provide himself with the essentials of life. However, the chancery court found that Chapman wants to harvest the trees in order "to meet his monthly debts, buy a vehicle, get out of the house trailer and increase his standard of living." The chancellor thereafter denied Chapman's request for estovers.
 ¶ 19. The law as to estovers is not much litigated. "Estover" is defined as "[w]ood that a tenant is allowed to take for fuel, the manufacture or repair of agricultural instruments, and the erection and maintenance of fences and hedges; necessary supplies." Black's Law Dictionary, 572 (7th ed. 1999). That means that the wood is used by the life tenant himself, not sold.
 ¶ 20. One of the standard treatises on real property has given a useful explanation of the life tenant's rights. They include "the right to `take reasonable estovers from the land, that is, wood for fuel, fences, agricultural erections, and other necessary improvements and repairs." Thompson on Real Property, § 19.01, 721 (David A. Thomas ed., 2d ed. 1998). What is helpful about the treatise is that it traces the changing meaning of estovers as the culture, economy, and use of rural property has evolved. "The law involving the life tenant's right to cut standing timber . . . has made almost a full circle." Id. at § 19.08, 788. "In early American history, where land was required to be cleared for cultivation, timber was a nuisance and clearing did not constitute waste." Id. "But even under this rule neither a life tenant nor a grantee has a right to remove commercial timber from the land."Id. at 789. "Almost everywhere today, however, timber has become so valuable that the cutting of standing timber by the life tenant is waste." Thompson on Real Property, § 19.08, 790 (David A. Thomas ed., 2d ed. 1998). "Under the common law and the great weight today, the cutting of timber other than for estovers by a life tenant is waste. . . ." Id.
 ¶ 21. Certainly the concept of "waste" is the approach taken in Mississippi. Waste is a "substantial injury done to the inheritance, by one having a limited estate, during the continuance of his estate." MossPoint Lumber Co. v. Board of Supervisors of Harrison County, 89 Miss. 448,526, 42 So. 290, 300 (1906). *Page 154 
 ¶ 22. Chapman points us to a lengthy discussion in caselaw.
 By the common law of England, "waste" is defined with great accuracy, and ancient statutes there have made tenants for years liable for waste. The doctrine has been adopted in this country so far as it is suitable to our condition and circumstances as a new and growing country, and, in a more or less modified form, is administered in most, if not all, of the states of the American Union. The rigid rule of the common law that a tenant of a particular estate could not cut timber, except for estovers only, is in many jurisdictions modified so as to allow him to cut off the timber for clearing so much of the estate as the needs of his family may require for their support, though the timber be destroyed thereby. And he may clear for cultivation such portions of it as a prudent owner in fee would clear for that purpose, provided he leaves enough timber and wood as may be necessary for the permanent use and enjoyment of the inheritance. His right to open and clear for cultivation wild and uncultivated land is that of a prudent owner, having regard to its amelioration as an inheritance. When the particular tenant cuts timber in the process of clearing the land for immediate cultivation, he can appropriate it or its proceeds to his own benefit, but he cannot cut the timber for sale without making himself amenable for waste. When the timber is cut by the tenant or others unnecessarily or unlawfully, the right of the reversioner or remainderman at once attaches, and he may bring an action on the case in the nature of waste for his damages, or he may bring trover or replevin for the timber severed from the inheritance. Whether the tenant cut timber unnecessarily upon a claim of so doing for reasonable estovers or for the cultivation of the land, and whether sufficient wood and timber were left for the permanent use of the inheritance, are questions for the decision of the jury.
Board of Supervisors of Warren County v. Gans, 80 Miss. 76, 81-2,31 So. 539, 540 (1901) overruled on other grounds by Moss Point LumberCo. v. Board of Supervisors of Harrison County, 89 Miss. 448, 510,42 So. 290, 295 (1906).
 ¶ 23. Chapman emphasizes the phrase "so as to allow him to cut off the timber for clearing so much of the estate as the needs of his family may require for their support." He argues that estovers must therefore include more than wood for fuel, repair of agricultural implements, and the construction of fences. Chapman has confused the issue. The Supreme Court was describing the life tenant's right to clear a reasonable sized area for what might be best described as "subsistence farming." It was not permitting the periodic harvesting of timber for sale commercially. That would make the exception for estovers consume the general rule against waste.
 ¶ 24. Less than one year later, the Supreme Court spoke again to the question:
 While the law of waste, as established in England, is modified by its transplantation to this country to suit the conditions of a new and uncleared country, and to allow a tenant for life to open wild lands for necessary cultivation or to change the course of agriculture without being liable for waste, yet the cutting down of trees for his mere profit is here, as there, considered waste. . . . Trees, when felled, or severed from the soil, become personal property, in which the tenant in possession has no interest when cut for profit; and the reversioner may maintain his action for the possession of the property, or for damages therefor, in the same manner and with *Page 155 
like effect as if he were the owner of the estate in possession.
Learned v. Ogden, 80 Miss. 769, 779, 32 So. 278, 279 (1902).
 ¶ 25. Chapman attempts to fit under these limitations. He argues that he would only use the funds generated by the harvesting of timber for the essentials of life. In reality, Chapman hopes to supplement his present income with the funds generated by the harvesting of the timber. This is the "cutting down of trees for his mere profit" and is not done for the purpose of opening wild lands for cultivation or to improve the land. A life tenant cannot treat the estate in such a manner as materially to reduce its value below what it otherwise would be. It does not matter that the life tenant argues that "unless he be allowed to take some of the timber, his [life] estate will be of no value. . . . This could not alter the principle." Moss Point, 89 Miss. at 529-30,42 So. at 301-302.
 ¶ 26. Chapman also argues that because he personally planted 29,000 pine trees on the two parcels in question, that he should be allowed to harvest those trees. The equities involved should be judged in terms of what a reasonable understanding of the law would have led him to believe when he planted the trees. Chapman cites as support a decision in which a county board of supervisors sued the holders of a sixteenth section lease to prevent their harvesting of the timber. In agreeing that the leaseholders should be enjoined from harvesting timber, the Supreme Court appeared to emphasize that the lessee had not planted the trees.Bernard v. Board of Supervisors of Jackson County, 216 Miss. 387,398-99, 62 So.2d 576, 581 (1953). Yet we do not find a holding in that case that had the lessees planted the trees, that they would be entitled to them.
 ¶ 27. Regardless of the specific facts of the sixteenth section leasehold estate in Bernard, we find no authority that a life tenant, if he plants the trees, is exempt from the normal rules that we have already described that is applicable to waste. It should be noted that Chapman received reimbursement for the planting from the United States Department of Agriculture under a cost-sharing plan. Chapman also listed in the cost-sharing application that the primary purpose for the planting of the trees was "erosion control."
 ¶ 28. This Court has already spoken to the relative rights of Chapman and Thornhill to the timber on this property. That statement is collateral estoppel to the arguments here, since the cause of action in the earlier suit concerned whether Chapman had committed waste in the cutting of certain trees. Twin States Land Timber Co., Inc. v.Chapman, 750 So.2d 567, 570-71 (Miss.Ct.App. 1999). The cause of action is not the same as a different proposed cutting is involved here, but the parties and issues are the same. Collateral Estoppel Res Judicata, in 2 Jeffrey Jackson Mary Miller, Encyclopedia of Mississippi Law 350-52, § 14:7 (2001). Thus in Twin States, in which Thornhill was also a party, the issue was the extent to which the life tenant may harvest timber from an estate and not be liable to the remainderman for waste. We stated that the "circumstances include (a) when necessary to raise funds to pay the taxes on the property, (b) to provide timber for repair of fences and other improvements on the property, and (c) such harvesting as is indicated in the proper management and preservation of the property."Twin States, 750 So.2d at 571.
 ¶ 29. The chancellor in this suit made findings on the circumstances described in Twin States. Chapman had testified that the taxes on the two parcels averaged *Page 156 
seven dollars per month or eighty-four dollars per year. The chancellor found that Thornhill's offer to pay any future real property taxes would obviate the need to harvest timber for that purpose. The chancellor found that Chapman had no interest in cutting timber for the purposes of repairing fences or improving the property. As to the final circumstance, the chancellor found that based on the testimony of both foresters, the timber could be managed actively or passively. The active method required the cutting of timber to promote new growth. The passive method allowed the timber to grow naturally without cutting. The chancellor found that evidence did not "establish that one method is any better than the other." Therefore, there was no proof of a need to cut timber to manage or preserve the property.
 ¶ 30. We also stated in Twin States that "when the life tenant has been found to be harvesting the timber solely as a commercial enterprise, thereby damaging the value of the remainderman's estate, . . . the life tenant may be enjoined from further cutting and also be made to respond in damages for the diminished value of the remainder interest under principles of common law waste." Twin States,750 So.2d at 571.
 ¶ 31. Chapman looks to a different phrase in the opinion. We found that a "life tenant holds the exclusive right to the use, possession, and enjoyment of the property during the term of the tenancy." Id. at 570. "Trees growing upon the land are, until severed, a part of the real estate, and thus subject to the exclusive enjoyment of the life tenant to the total exclusion of the remainderman." Id.
 ¶ 32. Chapman argues that "to the total exclusion of the remainderman" decides the issue of his right to harvest timber during his tenancy. However, Chapman has taken this phrase out of context. His enjoyment is limited as it ends when the tree are severed. The right to sever, i.e., cut, is subject to the rules for waste.
 ¶ 33. One additional argument that Chapman makes is that language in the deed to the 76 acre property creating his life estate allows him to harvest the timber. The deed states that Chapman "shall have the right during my lifetime to lease said land for oil, gas, and other minerals and to appropriate all lease money, rentals, and production monies derived therefrom to his own use." This language refers solely to income derived from oil, gas, and other minerals. "There is no substantial connection between timber rights and mineral rights." Hood v. Foster,194 Miss. 812, 820, 13 So.2d 652, 654 (1943). This argument is without merit.
 Conclusion ¶ 34. The right of the life tenant to take estovers is limited. It is a concept more properly understood in the context of a primarily agrarian society rather than our present society. The life tenant has a limited right to cut timber without the permission of the remainderman. That right permits the raising of funds to pay taxes on the real property. The cutting is also allowed if needed to preserve the property or to allow the owner to provide himself food. These rights are not unlimited and must be exercised so as not to diminish the value of the estate.
 ¶ 35. The right to estovers does not grant the life tenant the right to harvest timber for commercial purposes. That is what Chapman wanted to do. There was no reason for the chancellor to order the employment of a forest manager, as there was no proof that good husbandry required thinning or other intensive management. *Page 157 
 ¶ 36. Finally, Chapman complains that the chancellor was without authority to order that Thornhill reimburse him for the taxes owed on the real property. Thornhill does not appeal that part of the chancellor's judgment, and Chapman has no standing to do so.
 ¶ 37. THE JUDGMENT OF THE CHANCERY COURT OF CLARKE COUNTY ISAFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING, P.J., BRIDGES, THOMAS, LEE, IRVING, MYERS,CHANDLER AND BRANTLEY, JJ., CONCUR.