CARLSON, Presiding Justice,
for the Court:
¶ 1. This case involves fifteen years of litigation relating to two testamentary trusts. The plaintiff, Veronica Baumgard-ner McKee Arrington (Arrington), claims that the trustee of both trusts, William Ready (Ready), mismanaged the trusts’ property, improperly allocated the trusts’ funds, and wrongfully refused to render an accounting of the trusts’ assets. The Chancery Court of Lauderdale County found that the trustee had acted properly and within his discretion in managing the trusts and that the trustee should not be required to render an accounting. Aggrieved, Arrington appealed to this Court. For the reasons discussed below, we affirm in part and reverse in part the judgment of the Chancery Court of Lauderdale County and remand for actions consistent with this opinion.
FACTS AND PROCEEDINGS IN THE TRIAL COURT
¶ 2. Harold Baumgardner (Harold) died on January 12, 1979. Before he died, Harold drafted a will and a codicil. Each instrument will be discussed in detail below.
A. Harold’s Will and Codicil
¶ 3. Harold’s will included a specific bequest of all his personal property to his wife, Emogene Baumgardner (Emogene). The will also included two general bequests of $1,000 to each of his two children, Veronica Arrington and Charlie Baumgardner (Charlie). The residue of Harold’s estate passed to two testamentary trusts: a marital deduction trust and a family trust. The trustee of both trusts, William Ready, was authorized to distribute the residue of Harold’s estate between the two trusts.
1. Marital Deduction Trust
¶ 4.' Harold’s will instructed Ready to distribute the maximum amount available under federal estate-tax law to the marital deduction trust. The majority of the trusts’ property was timberland. Emogene was the life beneficiary of the marital deduction trust income. Ready was instructed to “pay the income annually or at more frequent intervals, if said trustee so elect” to Emogene. If the income from both the marital deduction trust and the family trust was insufficient to care for Emogene, Ready was instructed to distribute the corpus of the marital deduction trust for Em-ogene’s maintenance, care, and support. After Emogene’s. death, the marital deduction trust was to terminate, and the corpus of the trust, as well as any income not distributed, was to be distributed according to Emogene’s will. Emogene’s will devised one half of the corpus and income from the marital deduction trust to Arring-ton, and the other half to Arrington as trustee for Charlie.
2. Family Trust
¶ 5. Almost two weeks before he died, Harold revoked the provision of his will relating to the family trust in a codicil. The family trust included two parcels of land — the “home place,” and other land that was allocated to the family trust. The family trust in Harold’s will directed that Ready divide the family trust into two equal parts, and that one share should benefit Charlie and Arrington and the oth *596 er should benefit Emogene.[1] The family-trust provision in the will also directed that any income not distributed should be added to the corpus of the trust. Upon Emogene’s death, the corpus of the trust was to be distributed to Arrington and Charlie equally. All of these provisions were revoked in Harold’s codicil.
¶ 6. The codicil directs that the corpus and income of the family trust should be distributed to Emogene.[2] Any income not distributed to Emogene was to be added to the corpus of the trust. Upon Emogene’s death, the corpus of the trust was to be distributed as follows: the home place (Harold and Emogene’s home and approximately 600 acres surrounding it) to Ar-rington and Charlie equally; and the balance of the corpus to five named charities.[3]
B. Procedural History
¶ 7. In 1996, Arrington was named conservator of Emogene’s estate and person. The judgment appointing Arrington as conservator stated that two physicians had determined that Emogene was unable to handle her own affairs because of her advanced age and physical incapacity. In 1998, Arrington filed a motion for authority to institute litigation on behalf of Emo-gene in the Chancery Court of Lauderdale County. The motion alleged that, despite Emogene’s requests, Ready had never provided Emogene with an accounting of the trusts. The motion also alleged that Ready had breached his fiduciary duty by failing to properly manage the timberland, entering into an agreement for the purchase of timber with the same party who managed the timberland, not paying all of the income from the marital deduction trust to Emogene, borrowing money from Emogene, and obtaining a revocation of power of attorney from Emogene without the knowledge of her attorney. The chancellor entered a judgment authorizing litigation in 1998.
¶ 8. Arrington then filed a complaint for accounting and removal of trustee, claiming that Ready had refused to provide an accounting of the trusts and had failed to pay Emogene funds required by the trusts. Arrington requested that the chancellor require Ready to provide an accounting, remove Ready as trustee, ap *597 point a successor trustee, and require Ready to reimburse the trusts for the costs associated with the litigation.
¶ 9. Ready filed a response to Arring-ton’s complaint, contending, inter alia, that the chancery court did not have jurisdiction over the matter and denying most of the allegations in the complaint. Ready also filed a motion to remove Arrington as conservator of Emogene’s estate, essentially arguing that Arrington had a conflict of interest. He also filed a motion for summary judgment, contending that provisions of Harold’s will relieved him of any liability for errors of judgment, other than those committed in bad faith. Ready also contended that Harold’s will allowed him to refuse to provide an accounting. Harold’s will states that Ready was to “serve without bond, inventory or accounting.”
¶ 10. On his own motion, the chancellor appointed Edward Kramer as Emogene’s guardian ad litem. After he was appointed as guardian ad litem, Kramer filed a report and recommendation with the chancery court. In the report, Kramer stated that he had examined the trusts’ records and found them to be financially sound. After receiving Kramer’s report, the chancellor, sua sponte, ordered an appraisal (forester’s report) of the timberland in the marital deduction trust and the family trust. The chancellor also appointed Kramer as conservator of Emogene’s estate. Arrington remained as conservator of Emogene’s person.
¶ 11. In May 2002, the chancellor entered an Order for Sale of Timber. In his order, the chancellor stated that the forester’s report demonstrated that timber in both trusts was subject to insect infestation and was not being “managed in a manner maximizing monetary return and growth potential.” The order also stated that the timber should be sold to “preserve the capital value of each trust,” and that Ready and Kramer both agreed with his conclusion. The forester, Charlie Jones, was appointed by the chancellor to solicit bids and submit them to Ready and Kramer.
¶ 12. Seven bids were made. Ralph Morgan was the highest bidder at $8,070,840.50; $1,066,985.25 was attributable to the timber on the marital deduction trust land, $986,084.25 to the family trust land (excluding the home place), and $1,017,671 to the home-place land.[4] Ready accepted Morgan’s bid, and Kramer recommended to the chancellor that he approve Ready’s actions. The chancellor entered an order accepting Ready’s actions and directing him to allocate the proceeds of the timber sale to each trust. The chancellor also ordered that, after the timber sale, the assets of the marital deduction trust be transferred to Emogene’s conservatorship and the marital deduction trust be dissolved. Emogene died in 2004 while the timber was being harvested.
¶ 18. In response to the chancellor’s order, Arrington filed a motion requesting, inter alia, that the chancellor order Ready to distribute the timber proceeds from the home-place land to her and Charlie as remainder beneficiaries of the home-place land. The motion stated that Ready had “retained in the family trust the net of the sale of the timber on the family trust lands; and, also kept in the family trust all of the net of the sale of the timber on the home place lands. However, the family trust only owned a life estate in the home place lands.” In response to Arrington’s *598 motion, Ready argued that the proceeds of the home-place timber became part of the trust corpus and, upon Emogene’s death, the liquid assets would pass to the five charities named in Harold’s will.
¶ 14. After a hearing, the chancellor entered a final judgment, finding that Ready had acted within his discretion in allocating the proceeds of the timber sale. The chancellor also ordered that the parties attempt to agree on the amount of money used to support Emogene that was not paid from the trusts. The conserva-torship was to be reimbursed for this amount from the trusts’ accounts. The parties could not agree on an amount, and the chancellor entered a supplemental final judgment, finding that the trusts should reimburse Emogene’s conservatorship for $205,000. Arrington now appeals to this Court.
DISCUSSION
¶ 15. This Court employs a limited standard of review on appeals from chancery court. Corp. Mgmt., Inc. v. Greene County, 23 So.3d 454, 459 (Miss.2009). As such, this Court “will not disturb the factual findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, [or his findings were] clearly erroneous[,] or [he] applied an erroneous legal standard.” Id. (quoting Biglane v. Under the Hill Corp., 949 So.2d 9, 13-14 (Miss.2007)). Questions of law are reviewed de novo. Corp. Mgmt., 23 So.3d at 459. Arrington presents the following four issues on appeal:
1.The trial court erred by ordering a report of the Guardian Ad Litem and ordering a report of a forester, allowing the Defendant Trustee access to those reports, denying Appellants access to those reports and using those reports as evidence and as the basis of its Order For Sale Of Timber.
2. The trial court erred by entering its Order For Sale Of Timber, its Order To Accept Timber Bids And To Transfer Assets Of Baumgardner Marital Deduction Trust, and its Final Judgment.
3. The trial court erred in not requiring the trustee to give an accounting, including failure to require an accounting of the receipts, expenditures, and distributions of the money from the Court ordered timber sale and not ordering the trustee to pay specific amounts of sale proceeds to the proper parties.
4. The trial court erred in not requiring the trustee to fully reimburse the estate of Emogene Baumgard-ner for all of the moneys that the Conservatorship paid for her support, plus a reasonable interest rate on those funds.
On cross-appeal, Ready asserts the following: “The court lacked subject matter jurisdiction and Plaintiffs lacked standing to sue.” These issues will be restated and reorganized for the purposes of this opinion, and we will discuss only those issues that are dispositive of today’s case. Mid-South Retina, LLC v. Conner, 72 So.3d 1048, 1050 (Miss.2011).
I. Whether the Chancery Court of Lauderdale County has subject matter jurisdiction over the case.
¶ 16. On cross-appeal, Ready contends that the chancery court does not have subject matter jurisdiction over this case because it concerns a private trust and is not an action in an ongoing estate. Before the chancery court, Ready moved to dismiss the case for lack of subject matter jurisdiction. The chancellor denied Ready’s motion.
*599 ¶ 17. Whether a chancery court has jurisdiction is a question of law, to which this Court applies a de novo standard of review. In re Adoption of D.N.T., 843 So.2d 690, 697 (Miss.2003). Article 6, Section 159 of the Mississippi Constitution governs the subject matter jurisdiction of chancery court. Section 159 states, in part: “The chancery court shall have full jurisdiction in ... matters testamentary and of administration.” This Court has long held that chancery courts have jurisdiction over trust administration. Reedy v. Johnson’s Estate, 200 Miss. 205, 26 So.2d 685, 688 (1946) (quoting 54 Am. Jur. Trusts § 276) (“Courts of equity have original, general, and inherent jurisdiction over trusts and the administration thereof.”). See also Nutt v. State, 96 Miss. 473, 51 So. 401, 402 (1910).
¶ 18. Recently, in Trustmark National Bank v. Johnson, 865 So.2d 1148 (Miss.2004), this Court held that chancery court, rather than circuit court, had jurisdiction over claims relating to a trustee’s duties. The plaintiffs in Trustmark brought claims of negligence, breach of contract, breach of fiduciary duty, and gross negligence against the trustee, Trustmark, in the Circuit Court of the First Judicial District of Hinds County. Id. at 1151. The grantor, Ruth Biedenharn, died after the trust was created, and her will was admitted to probate in the Chancery Court of Warren County. Id. at 1150. The chancery court had “exercised judicial oversight of the trust agreement in accordance with its terms and the terms of Ruth’s will, all as part of the overall administration of Ruth’s estate.” Id. Finding that the circuit court did not have jurisdiction over the plaintiffs claims relating to the trust administration, this Court stated:
Trustmark’s actions or inactions which are at issue arise solely from its capacity as the Trustee of the Ruth S. Bieden-harn Trust and any duty Trustmark may have arises from its appointment as Trustee. This action seeks to interpret the Trustee’s obligations under the terms of the trust. The trust is under the exclusive jurisdiction of the Warren County Chancery Court and has been since its inception.
Id. at 1151.
¶ 19. Similar to the claims in Trust-mark, the claims in today’s case relate to Ready’s obligations under the marital deduction trust and the family trust. Because chancery courts have jurisdiction over trust administration, and Arrington’s claims relate to Ready’s actions as trustee, we find that the Chancery Court of Laud-erdale County has subject matter jurisdiction over this case. This issue is without merit.
II. Whether the Plaintiff had standing to bring the claim.
¶ 20. Ready contends on cross-appeal that Arrington does not have standing to bring a claim against him as trustee because she has no “colorable interest” in the trusts. Ready argues that under the language of Harold’s will and codicil, Arring-ton had only a contingent remainder interest in the trust property while Emogene was still alive-the contingency being that the trust corpus might be used to support Emogene and the assets might have been exhausted by the time Arrington’s interest vested.

A. Standing as Conservator/Executor

¶ 21. “[S]tanding is to be determined as of the commencement of suit.” Burley v. Douglas, 26 So.3d 1013, 1020 (Miss.2009) (citing Delta Health Group, Inc. v. Estate of Pope, 995 So.2d 123, 126 (Miss.2008) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 571, 112 S.Ct. 2130, 2142, 119 L.Ed.2d 351, 371 (1992))).
*600 ¶ 22. At the time Arrington filed suit against Ready, she was the conservator of Emogene’s estate and person. On January 7, 1998, prior to filing the complaint for accounting, Arrington filed a motion for authority to institute litigation in the Chancery Court of Lauderdale County. She filed the motion as conservator of Emogene’s estate and person. The motion was granted on January 14, 1998. That same day, Arrington filed a complaint against Ready as conservator of Emo-gene’s estate and person.
¶ 23. The ability of a conservator to file suit on behalf of a ward is governed by statute. Mississippi Code Section 93-13-259 (Rev.2004) gives a conservator the same power as a guardian of a minor and states:
Should the court appoint the conservator of the property or person or property and person of the subject party, the said conservator shall have the same duties, powers and responsibilities as a guardian of a minor, and all laws relative to the guardianship of a minor shall be applicable to a conservator.
Mississippi Code Section 93-13-27 (Rev. 2004) allows guardians to file suit on behalf of a ward and reads, in part:
All suits, complaints, actions and administrative and quasi judicial proceedings for or on behalf of a ward for whom a general guardian has been appointed shall be brought in the name of the general guardian for the use and benefit of such ward, be such general guardian that of his estate and person or that of his person only. And all such actions, suits or proceedings shall be commenced only after authority has been granted to such general guardian by proper order and decree of the court of chancellor of the county in this state in which the guardianship proceedings are pending, upon proper sworn petition and supporting oral testimony.
¶ 24. Arrington was conservator of Em-ogene’s estate and person when she filed suit against Ready, and standing is determined at the time suit is commenced. Accordingly, she had standing to file suit on Emogene’s behalf.

B. Standing Based on Remainder Interest

¶ 25. With regard to Ready’s assertion that Arrington does not have standing because she had only a contingent remainder in the home-place land, we find that Ready’s argument is without merit. Arrington filed one pleading before Emo-gene’s death individually and as conservator — an objection to the report and recommendation of the guardian ad litem in 2002. The remaining pleadings filed before Emogene’s death were filed by Ar-rington as conservator only. Based on the discussion above, Arrington had standing as conservator to file suit against Ready.
¶ 26. Considering only the objection filed by Arrington individually in 2002, she had standing based on her remainder interest in the home-place property. Ready contends that Arrington does not have standing because she had a contingent remainder — the contingency being that property was remaining in the trust at the time of Emogene’s death.[5]
¶ 27. Although Arrington did not have a present possessory interest in the property at the time she filed suit, her remainder interest was vested. The law *601 favors vesting of remainders, and a remainder interest will be contingent only if the testator clearly intended such. McClelland v. Bank of Clarksdale, 238 Miss. 557, 119 So.2d 262, 267 (1960). “A remainder interest in an irrevocable trust represents a present fixed right to future enjoyment that gives rise to a vested property interest in trust property even if that interest is subject to complete divestment or defeasance.” 76 Am.Jur.2d Trusts § 252 (2005). See also Hays v. Cole, 221 Miss. 459, 478, 73 So.2d 258, 264 (1954) (“If there is a present right to a future possession, though that right may be defeated by some future event, contingent or certain, there is nevertheless a vested estate.”); McClelland, 119 So.2d at 267 (“[A] gift of a life estate with remainder to a named person creates a vested remainder on the death of the testator.”). Because Arring-ton’s interest in the trust property was vested, Ready’s argument that she does not have standing because her interest was contingent has no merit.
¶ 28. In sum, we find that Ready’s contention that Arrington did not have standing to file suit against him as trustee is without merit. Standing is determined at the commencement of the suit. Burley, 26 So.3d at 1020. At that time, Arrington had standing as conservator of Emogene’s estate and person, and by her remainder interest in the trust property. Moreover, Ready’s assertion that Arrington lacked standing because her interest in the trust property was contingent fails because Ar-rington had a vested remainder interest in the property.
III. Whether the chancellor erred by entering its Final Judgment and by not requiring Ready to properly allocate the timber proceeds.
¶ 29. Arrington contends that the chancellor erred in allowing Ready to allocate the home-place timber proceeds to the family trust. Arrington takes several approaches to this argument: (1) she and Charlie are entitled to the funds as remainder beneficiaries of the home-place land; (2) it was Harold’s intent for Arring-ton and Charlie to receive any proceeds from the home-place timber sale; and (3) the chancellor’s Order for Sale of Timber directs that the home-place proceeds be paid to Emogene’s conservatorship.

A. Harold’s Will and Codicil

¶ 30. Harold’s will established two testamentary trusts: a marital deduction trust and a family trust. Emogene was the life beneficiary of the marital deduction trust income. Upon Emogene’s death, the marital deduction trust corpus, along with any undistributed income, was to pass to Emogene’s estate to be distributed under the terms of her will. During the present litigation, but before Emogene died, the chancellor ordered that the marital deduction trust be dissolved. In the same order, the chancellor ordered that the liquid assets of the marital deduction trust be transferred to Emogene’s conser-vatorship. After the chancellor entered this order, $744,467.62 was paid from the marital deduction trust to Emogene’s con-servatorship. The record is unclear as to whether this includes all of the timber sale proceeds from the marital deduction trust timber. Under Emogene’s will, the money in her conservatorship was to pass to Ar-rington and Charlie equally.
¶ 31. The provisions in Harold’s will that established the family trust were revoked in a codicil. The family trust included the home-place land as well as other land. The codicil instructed that if the income from the marital deduction trust and any other sources of income were insufficient to maintain Emogene’s standard of living, that the income from the *602 family trust may be distributed to Emo-gene. The codicil also instructed that any income not distributed to Emogene should become part of the trust corpus. Under the codicil, upon Emogene’s death, the home place (the home and 600 acres surrounding it) was to pass to Arrington and Charlie equally. The codicil also instructed that “the balance of the corpus of the trust shall be divided equally between” five named charities.
¶ 32. From the parties’ briefs, the essential issue seems to be whether the timber proceeds from the home-place land are payable to Charlie and Arrington or to the charitable beneficiaries. Arrington and Charlie claim that they are the beneficiaries of the home-place timber proceeds, and Ready contends that the charities are the beneficiaries of all the family trust timber proceeds.

B. Testator’s Intent

¶ 33. Arrington contends that it was not Harold’s intent for the charitable beneficiaries to receive home-place timber sale proceeds.
¶ 34. The testator’s intent is controlling when construing a will. Weissinger v. Simpson, 861 So.2d 984, 987 (Miss.2003). The testator’s intent should be gathered from the entire will, giving due consideration and weight to every word in it. Id. The function of this Court is not to determine a just and fair disposition of the estate, but instead to respect the testator’s intent. In re Estate of Dedeaux, 584 So.2d 419, 421 (Miss.1991) (citations omitted).
¶ 35. We have always placed great emphasis on the testator’s intent. In Deposit Guaranty National Bank of Jackson v. First National Bank of Jackson, 352 So.2d 1324, 1326-27 (Miss.1977), this Court stated:
The paramount and controlling consideration is to ascertain and give effect to the intention of the testator. In arriving at this intention, the court is required to consider the entire instrument, sometimes said “from the four corners of the instrument.” Where the instrument is susceptible of more than one construction, it is the duty of the court to adopt that construction which is most consistent with the intention of the testator.
When considering testamentary gifts to charitable beneficiaries, this Court has stated: “We are not at liberty to infer an intent different from that clearly shown by the language of the will despite the Court’s favorable disposition toward charitable gifts.” Johnson v. Bd. of Trs. of Miss. Annual Conference of United Methodist Church, 492 So.2d 269, 276 (Miss.1986).
¶ 36. With these principles in mind, we consider the language of Harold’s codicil. Harold’s codicil did not expressly mention how timber proceeds should be distributed. Given that the two trusts were designed to support Emogene, it is unlikely that Harold anticipated a large timber cutting similar to the one that is the subject of today’s case. Harold’s codicil instructed that, after Emogene’s death, the home place was to pass to Ar-rington and Charlie and the remainder of the family trust was to pass to five named charities. Along with the home-place land, Arrington and Charlie were given all of the mineral rights to the home-place property. We recognize that timber and mineral rights are distinct. See Hood v. Foster, 194 Miss. 812, 13 So.2d 652, 653-54 (1943). But this tends to show Harold’s intent was to give his children more than just the house and home-place land. Further, the codicil includes the condition that Arrington and Charlie keep their portion of the home-place property until age forty. When reading the instrument as a whole, *603 we find that it was Harold’s intent for Arrington and Charlie to inherit not only the house and home-place land, but the timber proceeds from the home place as well.

C. Remainder Interest in Timber Land

¶ 37. Our caselaw relating to remainder interests in timber further supports our finding that Arrington and Charlie are the beneficiaries of the home-place timber proceeds. A life tenant’s interest in land, and timber growing on the land, is limited. A life tenant may harvest timber without the consent of the remaindermen under the following circumstances: (1) when necessary to raise funds to pay the taxes on the property, (2) to provide timber for repair of fences and other improvements on the property, and (3) when necessary for the proper management and preservation of the property. Twin States Land & Timber Co., Inc. v. Chapman, 750 So.2d 567, 570-71 (Miss.Ct.App.1999) (citing Threatt v. Rushing, 361 So.2d 329, 331 (Miss.1978); Bd. of Supervisors of Warren County v. Gans, 80 Miss. 76, 31 So. 539, 540 (1901); Cannon v. Barry, 59 Miss. 289, 303 (1881)). When timber is wrongfully severed, remaindermen may maintain an action for either possession of the timber or for damages to the inheritance. Learned v. Ogden, 80 Miss. 769, 779, 32 So. 278, 279 (1902).
1138. In Learned, this Court explained the rights of tenants and remaindermen with regard to growing timber. Learned, 80 Miss. 769, 32 So. 278, 279, states:
While the law of waste, as established in England, is modified by its transplantation to this country to suit the conditions of a new and uncleared country, and to allow a tenant for life to open wild lands for necessary cultivation or to change the course of agriculture without being liable for waste, yet the cutting down of trees for his mere profit is here, as there, considered waste. A tenant by the curtesy, as an incident to his estate, may take reasonable estovers of all kinds, and he may cut timber to pay taxes, or to improve land, and when so cut it belongs to the tenant, and not the reversioner. But the cutting down by the tenant of trees for sale is waste, and the felling of trees by the tenant or others for sale of them is an injury to the inheritance, for which the reversion-ers have their appropriate action. Trees, when felled, or severed from the soil, become personal property, in which the tenant in possession has no interest when cut for profit; and the reversioner may maintain his action for the possession of the property, or for damages therefor, in the same manner and with like effect as if he were the owner of the estate in possession.
(Emphasis added.)
¶ 39. Learned has been cited several times by this Court and the Court of Appeals for the proposition that a life tenant’s harvesting of timber for commercial purposes constitutes waste. See Threatt, 361 So.2d at 331; Bernard v. Bd. of Supervisors, Jackson County, 216 Miss. 387, 396-97, 62 So.2d 576, 580 (1953); Chapman v. Thornhill, 802 So.2d 149, 154-55 (Miss.Ct.App.2001); McCorkle v. Loumiss Timber Co., 760 So.2d 845, 853-54 (Miss.Ct.App.2000); Twin States Land & Timber Co., 750 So.2d at 572.
¶ 40. It should be noted that the chancellor stated in his order that “prudent management of the said Trusts assets dictated that the timber be promptly sold in a commercially reasonable manner to preserve the capital value of each trust.” (Emphasis added.) Ready’s argument that all of the profits from the family trust should go to the charitable beneficiaries *604 seems to run afoul of the principle that remaindermen may maintain an action for waste when the value of their inheritance has been injured through the harvesting of timber. See Learned, 80 Miss. 769, 32 So. 278, 279.
¶ 41. According to Learned, life tenants do not have an interest in trees once they are severed from the land. Id. The only time a life tenant may maintain an interest in severed timber is under one of the three exceptions discussed above: (1) when necessary to raise funds to pay the taxes on the property, (2) to provide timber for repair of fences and other improvements on the property, and (3) when necessary for the proper management and preservation of the property. Twin States Land & Timber Co., 750 So.2d at 570-71.
¶ 42. In Bernard, the plaintiff sought to enjoin the defendants from harvesting timber growing on sixteenth-section land leased by the defendants. Bernard, 62 So.2d at 577. The chancellor entered an order enjoining the defendants from harvesting the timber, and the defendants appealed to this Court. Id. at 577-78. This Court considered whether the owner of a lease on sixteenth-section land may cut and sell timber. Id. at 579. Citing Learned the Court in Bernard held that a tenant for years who harvests timber commits waste. Id. at 580-81. Further, the Court held that harvesting timber is an injury to the realty, and thus an injury to the inheritance or reversionary interest. Id. at 581.
¶ 43. In Threatt, the defendant owned a life estate and a one-fourth fee interest in timber land. Threatt, 361 So.2d at 330. The plaintiffs — the other remaindermen— sought to enjoin the defendant from harvesting the timber, and the chancery court granted the injunction. Id. This Court affirmed the chancery court, finding that cutting of timber by the life-estate owner injured the remainderman’s interest in the realty. Id. at 331.
¶ 44. In sum, we find that it was Harold’s intent for his children to inherit the timber proceeds from the home-place land. Further, because the timber harvest substantially diminished the value of the land inherited,[6] the remaindermen — Ar-rington, Charlie, and the charitable beneficiaries — are entitled to the value of the harvested timber on their respective properties. Arrington and Charlie are entitled to the timber proceeds of the home-place land, and the charitable beneficiaries are entitled to the proceeds of the timber sales from the rest of the family trust land. Accordingly, we find that the chancery court erred by allowing Ready to allocate all of the family trust proceeds to the charitable beneficiaries.
IV. Whether the chancellor erred by not ordering an accounting.
¶ 45. Arrington contends that Ready should be required to render an accounting of the trusts’ accounts. To support this argument, she claims that Ready and Harold had a close relationship and alludes to Ready having some undue influence over Harold. Arrington also claims that, without an accounting, there is no showing that Ready properly distributed the timber-sale proceeds from the family trust and home-place lands. She seems to assert that Ready may have improperly retained some of the proceeds or charged excessive fees.
¶ 46. Generally, executors and administrators of estates are required to submit *605 an annual accounting to the court. Miss. Code Ann. § 91-7-277 (Rev.2004). This requirement prevents estates from diminishing in value, and protects the testator’s intent and the heirs’ interests. Matter of Chambers, 458 So.2d 691, 693 (Miss.1984). But, under certain circumstances, it is possible for a testator to waive accounting. Harold’s will contained an express waiver of accounting. This Court has held that it is not error for a chancellor to refuse to order an accounting when the language of the trust expressly allows the trustee to serve without rendering an accounting. In re Jane W. Stubbs-Kelley Trust, 573 So.2d 734, 735-36 (Miss.1990). However, an express waiver of accounting does not absolve a trustee from rendering an accounting under all conditions. This Court, in In re Stubbs-Kelley Trust, stated that: “Of course [an express] waiver does not authorize the trustee to violate general equitable principles in dealing with the trust. For example, evidence of mismanagement or fraud in the record could warrant an accounting even in the presence of an explicit waiver.” Id. at 736 n. 2 (citing Harper v. Harper, 491 So.2d 189, 200 (Miss.1986); Lambdin v. Lambdin, 357 So.2d 302, 307 (Miss.1978); Bailey v. Sayle, 206 Miss. 757, 40 So.2d 618 (1949)).
¶ 47. In Van Zandt v. Van Zandt, 227 Miss. 528, 86 So.2d 466 (1956), the plaintiffs brought a claim for an accounting against a cotenant who sold timber on land owned by the cotenant. The chancellor found that there was evidence that the defendant had fraudulently converted part of the plaintiffs’ pro-rata share of the timber proceeds to his own use and ordered that the defendant pay the plaintiffs their share of the proceeds. Id. at 535, 86 So.2d 466. This Court affirmed the chancery court, finding that there was ample evidence in the record that the defendant fraudulently had concealed information relating to the timber sale and had failed to pay the plaintiffs their respective shares of the sale proceeds. Id. at 539, 86 So.2d 466. The evidence at trial had shown that the defendant had paid $600 to the plaintiffs but that the plaintiffs’ share of the timber sale was approximately $13,000. Id. at 537, 86 So.2d 466.
¶ 48. The relationship of the parties in today’s case is distinguishable from the relationship in Van Zandt — trustee and beneficiary instead of cotenants. But, similar to the plaintiffs in Van Zandt, Arring-ton asserts that Ready has mismanaged and improperly allocated the proceeds of the timber sale. In addition to Arrington’s assertion, the record includes evidence of mismanagement. For example, the chancellor ultimately required Ready to pay Emogene’s conservatorship $205,000 for unpaid support. Ready also had granted an option to purchase realty and timber to Ralph and Johnny Morgan — the same people who were managing the timber lands. The guardian ad litem found that this created “the appearance of impropriety in the management of the properties.” Ready also borrowed money from Emogene’s personal funds (not the trusts) while he was trustee. Finally, the record contains an affidavit from Leonard B. Cobb, Emo-gene’s attorney, stating that Ready had Emogene sign a revocation of general power of attorney without Cobb’s knowledge or consent.[7] This evidence, along with *606 Arrington’s assertions, demonstrates a possibility of mismanagement or impropriety. For this reason, we find that the chancellor erred in not ordering an accounting.
V. Whether the trial court erred in not requiring the trustee to fully reimburse the conservatorship for the amount paid for Emogene’s support, plus reasonable interest.
¶49. In his final judgment, the chancellor ordered that the conservator-ship should be reimbursed by the family trust for any expenses paid for Emogene’s support. As part of the final judgment, the chancellor requested that the parties agree on a reimbursement amount. The parties could not agree on an amount, and the chancellor entered a supplemental final judgment, finding that the conservatorship should be reimbursed for $205,000. The chancellor stated that this amount was based on his review of the conservatorship file and the pleadings in this suit. Arring-ton now contends that the chancellor erred in finding this amount. She claims that the conservatorship should be reimbursed $429,045.24, plus $104,653.81 interest or lost possible income. Aside from a general reference to the accountings filed by the conservator each year, Arrington provides no factual support for her contention. She does not provide an explanation of how the $429,045.24 amount was calculated or give any details of Emogene’s yearly expenses.
¶ 50. A chancellor’s factual findings will not be overturned absent an abuse of discretion. Corp. Mgmt., 23 So.3d at 459. If Arrington’s assertion is correct, then the almost $225,000 difference between the chancellor’s total and Arrington’s purported total amounts to an abuse of discretion. However, as noted above, it is unclear from the record how Arrington arrived at this amount. Accordingly, we find that, upon remand, a formal accounting of Emogene’s expenses should be conducted and that her conservatorship should be reimbursed for any expenses relating to her care and maintenance.
CONCLUSION
¶ 51. We reverse the chancellor’s judgment and remand this case for an accounting of the trust accounts and Emogene’s expenses. The timber proceeds from the home-place sale should be allocated to Ar-rington and Charlie, and the remainder of the family trust proceeds should be allocated to the charities listed in Harold’s codicil.
¶ 52. AFFIRMED IN PART; REVERSED IN PART AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.
WALLER, C.J., RANDOLPH, LAMAR, CHANDLER, PIERCE AND KING, JJ., CONCUR. KITCHENS, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY KING, J. DICKINSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION.

. The provision of the will relating to the family trust stated:
Distributed in whole or in part to or for the benefit of .Charlie Baumgardner and Veronica B. McKee, for their welfare, education, support and maintenance, in such amounts as may be deemed advisable in the discretion of the trustee; Distributed in whole or in part, to the extent said trustee deems advisable in the uncontrolled exercise of his discretion, to my wife, Emogene Baumgardner, but not to exceed that which is necessary for the maintenance of my said wife's customary standard of living, in any year in which the income from the Harold D. Baumgardner Marital Deduction Trust hereinabove created ... is insufficient for her said maintenance.

. The codicil states:
In the sole and absolute discretion of the Trustee, the said corpus and income of each share of the trust may be ... Distributed in whole or in part, to the extent said Trustee deems advisable in the uncontrolled exercise of his discretion, to my wife, Emogene Baumgardner, but not to exceed that which is necessary for the maintenance of my said wife’s customary standard of living, in any year in which the income from Harold D. Baumgardner Marital Deduction Trust, hereinabove created, and from all other sources is, in the sole judgment and discretion of my said Trustee, insufficient for her maintenance.

.The charities are: (1) The Mental Health Association of Lauderdale County, Mississippi; (2) The American Red Cross of Lauder-dale County, Mississippi; (3) OMS International, Ins., Greenwood, Indiana; (4) St. Labre Indian School, Ashland, Montana; and (5) Piney Woods School, Jackson, Mississippi.

. The home-place land is in the family trust. But a distinction between the two parcels is made because each has a different remainder beneficiary. Arrington and Charlie are the remainder beneficiaries of the home place, and the charities named in Harold’s codicil are the remainder beneficiaries of the rest of the family trust land.

. The family trust also contained the contingency that Arrington and Charlie both live on their respective property until the age of forty. Arrington and Charlie were both over the age of forty at the time of this litigation.

. $1,066,985.25 was attributable to the timber on the marital deduction trust land, $986,084.25 to the family trust land (excluding the home place), and $1,017,671.00 to the home-place land.

. Although we do not address whether Ready should have been removed as trustee, we take this opportunity to note that estate administrators have been removed by the court for various reasons. See Harper, 491 So.2d at 203 (removal based on payment of unprobat-ed claims, failure to file timely estate tax returns, and payment of attorney’s fees without court approval); Kelly v. Shoemake, 460 So.2d 811, 824 (Miss.1984) (removal based on misappropriation of estate funds). See also Miss.Code Ann. § 91-7-105 (Rev.2004) (re *606 moval of administrator for failure to return an inventory).