# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00698-COA

JASON BRELAND                                                    APPELLANT

v.

JOSEPH C. TURNAGE                                                APPELLEE

DATE OF JUDGMENT:              05/28/2021
TRIAL JUDGE:                   HON. SHEILA HAVARD SMALLWOOD
COURT FROM WHICH APPEALED:     MARION COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:        WILLAM L. DUCKER
ATTORNEY FOR APPELLEE:         JOSEPH LEONARD TURNEY
NATURE OF THE CASE:            CIVIL - REAL PROPERTY
DISPOSITION:                   AFFIRMED - 06/14/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE GREENLEE, P.J., LAWRENCE AND McCARTY, JJ.

### LAWRENCE, J., FOR THE COURT:

¶1.    On February 12, 2004, Verdie Regan (Regan) conveyed 34.75 acres of land to her grandchildren Joseph Turnage (Joseph) and Jerred Turnage (Jerred). She also conveyed an adjoining 34.75 acres to her grandson Jason Breland (Breland). She reserved a life estate in both parcels. On October 8, 2007, Jerred conveyed his interest to his brother, Joseph. On December 1, 2018, Regan entered into a "Timber Harvest Agreement" with Williamson and Son Logging LLC, and the company began clear-cutting timber from all seventy acres of the land. Joseph, who was living in Texas at the time, was not informed of this agreement. He later learned about the clear-cutting, traveled to the property, and told the company to stop cutting. The company continued cutting until all the timber was removed. The money for

the timber was given to Breland. Joseph sued Breland. On January 26, 2021, a trial was held. At the conclusion of the trial, the chancellor ruled in favor of Joseph and ordered Breland to pay Joseph one-half of the money he had received. Breland appealed this decision and argues: (1) the chancellor erred in denying his motion challenging jurisdiction; (2) the chancellor erred in determining damages; and (3) the chancellor erred in "overruling [Breland's] Motion Objecting to Certain Testimony of the Appellee Joseph Turnage because of Rule 404(b)(2) of [the] Mississippi Rules of Evidence."

## FACTS

¶2.    On February 12, 2004, Regan conveyed 34.75 acres of land to her grandchildren Joseph and Jerred. Regan reserved a life estate in the land. On October 8, 2007, Jerred signed a quitclaim deed, transferring his property interest in the 34.75 acres to Joseph. "Simultaneously," Regan conveyed an "adjoining parcel" of 34.75 acres to her grandson Breland and reserved a life estate in the land.

¶3.    On December 1, 2018, Regan entered into the "Timber Harvest Agreement" with Williamson and Son Logging LLC to "clear cut" all seventy acres of the land, which included the 34.75 acres in which Joseph held a vested remainder. Joseph was not informed of this contract, and he was never shown the contract. In January 2019, Joseph was notified by his sister, Courtney Lemus (Courtney), that the land was being clear-cut. Joseph went to the land and spoke to Ryan Williamson (Williamson). Joseph told Williamson to stop cutting the timber. When this conversation occurred, half of the timber was still standing.

¶4.    Williamson contacted Joseph's attorney, Joseph Turney (Turney), and Breland's

2

brother, Jeffrey Breland (Jeffrey). After conversations with both men, Williamson continued cutting the timber. When the clear-cutting was completed, Williamson and Son Logging LLC sent Breland four checks, totaling $55,620.81. Joseph was never given any money for the clear-cutting of the timber. Joseph filed a complaint on February 4, 2019, against Breland, Regan, Tami Breland (Tami), and Debra Pyke (Pyke). Regan died during the litigation, and she was dismissed as a party. On September 22, 2020, prior to the trial, Joseph sold his 34.75 acres to his sister Courtney and her husband Julio Lemus (Julio).

¶5. On January 26, 2021, a trial was conducted in chancery court. Joseph called seven witnesses.

### 1. Joseph Turnage

¶6. On direct examination, Joseph testified that he had a vested remainder interest in 34.75 acres of land at the time of timber cutting, and Regan held a life estate for that same parcel. Joseph stated that he was not told about a contract to clear-cut the property. Joseph stated that he first learned that the timber was being cut through his sister Courtney. Once he learned about the clear-cutting, Joseph and his wife, Ann Turnage (Ann), drove to the property. Joseph testified that when he arrived, he spoke to "the guy cutting" the land[1] and said that "it wasn't to be cut." Joseph stated that there was still "standing timber" on the property when he left. He testified that he has not been paid for any of the timber that was clear-cut from the property. Joseph testified that Breland was the only person who got paid for the profit from the clear-cutting. Joseph stated that he sold the clear-cut property to

---

[1] The "guy" was Williamson.

3

Courtney for less than what he would have sold it for if the timber were still on the land.

¶7.     On cross-examination, Joseph testified that he was not a party to the timber contract. Joseph was asked, "Of what crimes do you stand convicted?" Joseph's attorney objected. Breland's attorney argued that Joseph's prior convictions were important to impeach Joseph. The prior convictions were for child fondling and simple assault. The court asked Breland's attorney what his purpose was for introducing the evidence of Joseph's prior convictions, and Breland's attorney responded, "Credibility." The court responded, concluding, "Mississippi Rules of Evidence prohibit evidence of a particular crime— it's not admissible to prove character . . . so I'm going to sustain the objection and exclude questioning about those . . . [and] it's close to the ten-year period that it . . . needs to be excluded." On redirect, Joseph was asked, "[W]hat did that timber mean to you?" Joseph responded, "Security for future."

### 2.     Ann Turnage

¶8.     On direct examination, Joseph's wife Ann  testified that she and Joseph never knew about the timber contract until Courtney called her and said, "I didn't know y'all were getting the timber cut." Ann stated that after the call, she and Joseph drove to the property in Mississippi.[2] She testified, "We got copies of the deeds. We took them out to the logger that was there and said, look, this is not their property. [Regan] doesn't have a right to cut the timber on it." Ann testified that when they left, after telling the logger to stop, there was still timber standing. Ann stated that the logger called Jeffrey who told the logger to "keep on cutting."

---

[2] Joseph and Ann were residing in Texas at the time.

4

¶9.　On cross-examination, Ann testified that she and Joseph asked Williamson to stop cutting the trees, and they referred him to their attorney, Turney. On re-direct, Turney asked Ann, "[D]o you recollect the discussion we had over the varying right to cut timber when there's a life estate on the property?" Ann stated that she did remember. Turney asked her if she remembered talking to him about how "a life estate owner has a very limited right to cut timber for a very specific purpose." Ann responded that she remembered, and she also had researched this issue.

¶10.　The court also questioned Ann. The court asked who paid taxes on the land, and Ann testified that Regan still paid the taxes.

### 3.　Felicia Alford

¶11.　On direct examination, Felicia Alford (Alford), a caretaker of Regan, testified that Regan's memory was fading. Alford also testified that she worked with Jeffrey's wife Tami in providing care to Regan. Alford testified that Tami paid her.

### 4.　Linda Melendez

¶12.　On direct examination, Linda Melendez (Melendez), another caretaker of Regan, testified that she helped Tami take care of Regan. Melendez testified that she "did not know about nobody cutting no timber or none of that until all this started coming out." Melendez also stated that Regan was not "aware of things like she used to be." On cross-examination, Melendez stated that she knew Tami had power of attorney to handle Regan's affairs.[3]

### 5.　Tami Breland

---

[3] Tami later testified that she only had power of attorney for a few months before Regan revoked it.

5

¶13.   On direct examination, Tami, Jeffery's wife, testified that she "helped take care of [Regan], paid [her] bills," and "just went and checked on her." She testified that she had seen Regan almost every day for the last two years of Regan's life. Tami testified that she was the only person who paid the caregivers. Tami stated that she did not give Regan a timber contract, nor was she present when Regan was presented with a timber contract. Tami testified that she was never given any money from the timber cutting, Regan was never given any money from the timber cutting, and Tami was not "asked to assist in getting that timber contract executed." Tami also testified that Jeffrey never received any funds from the timber cutting, and he did not benefit from the clear-cutting in any way.

### 6.   Jeffrey Breland

¶14.   On direct examination, Breland's younger brother Jeffrey stated that he and his wife lived next to Regan, so they took care of her. Jeffrey was asked, "[I]t has been alleged in this matter that you took part in getting [Regan] to sign a timber contract. Is that accurate?" He responded, "I don't know about signing a contract. I know she . . . told me she was having timber cut and such." Jeffrey testified that he was not present when the contract was signed. He testified that for a few years Regan had expressed a desire to have the timber on the seventy acres cut. Jeffrey testified that he told Regan "who was reputable" to hire for clear-cutting land. Jeffrey said he was not "aware" of any unpaid taxes, repairs, or maintenance needs associated with the property. On cross-examination, Jeffrey was asked if he was "ever hurt by helping your grandmother, or did you ever make any request on other family members that they denied?" Jeffrey responded, "No."

6

¶15. On redirect examination, Jeffrey testified that Pyke and Breland never offered to deposit proceeds from the timber cutting into his bank account. Jeffrey also testified that the "logger had given me some papers, said they were for taxes and things that had to be taken care of before he could cut the timber. . . . I don't know what was in there if there was a contract in there or it was taxes or something to do with taxes." He said he gave these documents to either Pyke or Breland.

¶16. The court asked Jeffrey, "Why cut the timber?" Jeffrey responded, "My grandmother wanted to cut it; said she wanted to cut it; said she wanted to give my mother, [Pyke], the money because she was giving him part of the land and him part of the land, and she wanted her to have the timber. That's what my grandmother said."

### 7. Ryan Williamson

¶17. On direct examination, Williamson testified that he worked for Williamson and Son Logging LLC. He testified that Jeffrey contacted him regarding the clear-cutting of property. Williamson testified that Jeffrey showed him the land to be clear-cut. Williamson stated that he did not give the timber contract to Regan. He stated that Jeffrey "called and talked with them and she said she wanted to cut it . . . so I sent him a W-9 form and a contract, and he left with it and come back in . . . five or ten minutes with it signed, her name on it." Williamson stated that the document was signed by himself and Regan. He stated that Pyke signed as a witness.

¶18. Williamson stated that Breland was not a party to the contract, but the checks were sent to Breland instead of Regan because Breland's information was put on the W-9.

Williamson did not know who filled out the W-9; he only knew that Jeffrey "left with a contract and a blank W-9 form . . . . When they brought it back to [him], it had [Breland's] name on it." Williamson testified that Breland came by the property every day. Williamson stated that he brought each check "to the woods with [him]" and gave them to Breland.

¶19. Williamson testified that Jeffrey "showed me what to cut." Williamson stated he confirmed that he could cut timber on behalf of Regan by going to the courthouse and checking public records. Williamson stated that he had "seen that she reserved a life estate on it, and if she reserved a life estate, she can legally cut the timber." Williamson testified that after Joseph and Ann approached him and told him to stop cutting the timber, he called Turney. He testified that he asked Turney, "[C]ould I legally cut that timber," and Turney responded, "[Y]es." Turney clarified, "I did not just solely say he could cut the timber, but he did not have the obligation to inquire as to what the proceeds were going to be used for; you just had to know who had title to it. The proceeds and how they were to be spent is a legal question."

¶20. After the clarification, the direct examination of Williamson continued, and Williamson agreed that Turney told him "there wasn't anything [he] could do to stop [Williamson] from cutting" the timber. Williamson also testified that he called Jeffrey to tell him that Joseph and Ann demanded he stop cutting the timber. Williamson stated that Jeffrey told him, "[I]f you can legally cut it, keep cutting." On cross-examination, Williamson testified that when Joseph and Ann left, there was still timber standing on the land.

8. **Joseph Turnage (re-called)**

8

¶21. The defense called one witness—Joseph. On direct examination, Joseph testified that he gave Williamson directions to stop cutting the timber. Joseph testified that he never paid Regan for the land.

¶22. On May 28, 2021, the chancellor issued his final judgment. The chancellor found (1) "[Joseph] [had] the necessary standing to file his complaint and the later sale of the property did not alter that position"; (2) Breland was "individually liable to [Joseph] for one-half of the funds received"; and (3) Joseph "failed to meet his burden of proof for the court to consider attorney fees."

¶23. Breland appealed, arguing: (1) the chancellor erred in overruling his motion challenging jurisdiction; (2) the chancellor erred in determining damages; and (3) the chancellor erred in "overruling [Breland's] Motion Objecting to Certain Testimony of the Appellee Joseph Turnage because of Rule 404(b)(2) of [the] Mississippi Rules of Evidence." Upon review of the record, this Court affirms the chancellor's decisions.

## ANALYSIS

### I. The court did not err in denying Breland's motion challenging jurisdiction.

¶24. Standing is a jurisdictional question that we review de novo. *Hobson v. Chase Home Fin. LLC*, 179 So. 3d 1026, 1031 (¶17) (Miss. 2015). Breland argues that the trial court did not have jurisdiction over the lawsuit because Joseph did not join Courtney and Julio, the new owners of the land, as parties to the suit. The chancellor found that Joseph did have proper standing because he owned the land at the time he filed his lawsuit, and the later sale of his property did not "alter that position."

9

¶25. "Parties have standing to 'sue or intervene when they assert a colorable interest in the subject matter of the litigation or experience an adverse effect from the conduct of the defendant, or as otherwise authorized by law.'" *Miss. High School Activities Ass'n Inc. v. R.T. ex rel. Trail*, 163 So. 3d 274, 277 (¶8) (Miss. 2015) (quoting *Dunn v. Miss. Dep't of Health*, 708 So. 2d 67, 70 (¶9) (Miss. 1998)). A colorable claim is one that appears "to be true, valid, or right." *In re City of Biloxi*, 113 So. 3d 565, 570 (¶13) (Miss. 2013). The claim being brought must be grounded in a legal right that is recognized by law. *Miss. High School Activities Ass'n*, 163 So. 3d at 277 (¶8). Additionally, a party must "be able to show that it has 'a present, existent actionable title or interest.'" *In re City of Biloxi*, 113 So. 3d at 570 (¶13) (quoting *Hall v. City of Ridgeland*, 37 So. 3d 25, 33 n.6 (Miss. 2010)). "Standing is to be determined as of the commencement of [the] suit." *In re Est. of Baumgardner*, 82 So. 3d 592, 599-60 (¶21) (Miss. 2012) (quoting *Burley v. Douglas*, 26 So. 3d 1013, 1020 (¶20) (Miss. 2009)).

¶26. The chancellor determined that Joseph had a colorable claim when he filed his complaint. *See Miss. High School Activities Ass'n*, 163 So. 3d at 277 (¶8). Joseph held a vested remainder in 34.75 acres of land that was clear-cut without his knowledge or permission. Additionally, Joseph's claim was grounded in a "legal right that is recognized by law." *Id.* The Mississippi Supreme Court has held that "[w]hen timber is wrongfully severed, remaindermen may maintain an action for either possession of the timber or for damages to the inheritance." *See In re Est. of Baumgardner*, 82 So. 3d at 603 (¶37) (citing *Learned v. Ogden*, 80 Miss. 769, 779, 32 So. 278, 279 (1902)). Joseph also experienced an

adverse effect from Breland's conduct. *See Miss. High School Activities Ass'n*, 163 So. 3d at 277 (¶8). Joseph was not paid any percentage of the profits from the clear-cutting. Only Breland was paid. Williamson testified that Breland's information was put on the blank W-9 he gave Jeffrey. Specifically, Williamson testified that when the W-9 form was returned to him, "it had [Breland's] name on it." Additionally, Joseph testified that he sold the 34.75 acres to Courtney for less than he would have been able to sell the land had it not been clear-cut. Therefore, Joseph had standing to continue the lawsuit.

## II. Joseph is entitled to damages based on the cutting of the timber.

¶27. Breland also argues that the chancellor erred in requiring him to pay Joseph for "one-half of the funds received" from the timber cutting. Breland cites *Attorney Q v. Mississippi Bar*, 587 So. 2d 228 (Miss. 1991), to argue that Joseph's "own lawyer could be partially responsible for his timber losses." This is the only case Breland cites to make his argument.[4]

¶28. The Mississippi Supreme Court has held that "[a] life tenant may harvest timber without the consent of the remaindermen under the following circumstances: (1) when necessary to raise funds to pay the taxes on the property, (2) to provide timber for repair of fences and other improvements on the property, and (3) when necessary for the proper management and preservation of the property." *In re Est. of Baumgardner*, 82 So. 3d at 603 (¶37). "When timber is wrongfully severed, remaindermen may maintain an action for either possession of the timber or for damages to the inheritance." *Id*. (citing *Learned*, 80 Miss. at

---

[4] In *Attorney Q*, the Mississippi Supreme Court stated that "a lawyer may not give advice to another who may be reasonably perceived to have conflicting interests where the other is not represented by counsel, other than advice to secure counsel." *Attorney Q*, 587 So. 2d at 233.

779, 32 So. at 279).

¶29.    *Learned v. Ogden* is instructive.  In *Learned*, four children with remaindermen interests in land that their father, W.F. Ogden Sr., still held a life estate in sued Learned for cutting down 30,000 cypress trees on that land.  *Learned*, 80 Miss. at 778, 32 So. at 278.  The trial court determined that Learned owed the Ogden children $34,133.96.  *Id*. at 279.  Learned appealed.  *Id*.  The Mississippi Supreme Court stated that a life tenant commits waste when he cuts down trees for profit.  *Id*.  The supreme court noted that a life tenant may cut down trees to "pay taxes, or to improve the land."  *Id*.  However, "the cutting down by the [life] tenant of trees for sale is waste, and the felling of trees by the [life] tenant or others for a sale of them is an injury to the inheritance, for which the reversioners have their appropriate action."  *Id*.  Additionally, the supreme court stated that "[t]rees, when felled, or severed from the soil, become personal property, in which the tenant in possession has no interest when cut for profit; and the reversioner may maintain his action for the possession of the property, or for damages therefor, in the same manner and with like effect as if he were the owner of the estate in possession."  *Id*.

¶30.    In the present case, no one testified that there was a need to raise funds for property taxes, provide timber for fence repairs or other improvements on the property, or to properly manage and preserve the property.  *See In re Est. of Baumgardner*, 82 So. 3d at 603 (¶37).  Jeffrey testified that he was not "aware" of any unpaid property taxes, repairs, or maintenance needs associated with the property.  The only reason provided to explain why Regan signed the contract to clear-cut her property was her desire to have the timber cut.

12

Jeffrey testified, "My grandmother wanted to cut it; said she wanted to cut it; said she wanted to give my mother, [Pyke], the money because she was giving him part of the land and him part of the land, and she wanted her to have the timber." However, under Mississippi law, a life-estate holder clear-cutting timber because she "wanted to" does not prevent a remainderman from filing an action "for damages to [his] inheritance." *See id.*; *see also Learned*, 80 Miss. at 779, 32 So. at 279.[5]

¶31.    The chancellor found that Joseph was entitled to collect damages for the profit obtained by devaluing his interest in the property. While Breland did not sign the timber contract, his information was on the W-9 form, and he was paid for all the timber. However, Breland held a vested remainder in only half of the land, so only half of the timber that was clear-cut was his personal property. The other half was Joseph's property. As the *Learned* court stated, when trees are cut, they become "personal property, in which . . . the reversioner may maintain his action for the possession of the property, or for damages therefor . . . ." *Learned*, 80 Miss. at 779-80, 32 So. at 279. In other words, Joseph's half of the timber that was cut was his personal property, and he was entitled to payment for the taking of that property. Therefore, Breland is personally liable to Joseph for half of the money Williamson and Son Logging LLC paid him, and the chancery court's ruling as to this issue is affirmed.

### III.    The chancellor did not err in prohibiting Breland from using Joseph's prior conviction to question his credibility.

¶32.    At trial, during Joseph's cross-examination, the following exchange occurred:

---

[5] Additionally, Pyke never received any money. Breland was the only individual who was paid.

**[Breland's Attorney]**: Okay. Of what crimes do you stand convicted?

**[Turney]**: Objection, Your Honor; relevance.

**[The Court]**: What's the relevance of the testimony?

**[Breland's Attorney]**: Impeaching credibility of the witness . . . . Moral turpitude . . . . As you said earlier or Mr. Turney did, I cannot say– you know, the crimes that we particularly talk about are what's, I believe, the old Latin term "crimen falsi" and that's perjury, grand larceny, embezzlement—I don't know, but it does not seem to have, you know, relevance to these, but what I was doing was–I do this in any case if somebody's got a conviction—I use it to try to impeach their testimony. I believe that's . . . Rule 404.

The trial court ultimately refused to admit the evidence and stated: "Rule 404 of the Mississippi Rules of Evidence prohibit evidence of a particular crime—it's not admissible to prove character . . . so I'm going to sustain the objection and exclude questioning about those . . . [and] it's close to the ten-year period that it . . . needs to be excluded."

¶33.    Breland argues on appeal that "[t]he [c]ourt erred in allowing . . . [Joseph] . . . to testify concerning **Mississippi land values when he had been a non-resident for seven** . . . **years because of a criminal conviction**." (Emphasis added).  Breland states in his brief that "[Joseph] could not come before the [c]ourt offering land values for his own benefit when he left the State of Mississippi because of a crime."  Breland claims that because the trial court did not allow Breland to "probe this matter because of the time factor . . .  a lot of parole evidence" was not admitted to impeach Joseph.  This was not the argument Breland made to the trial court.  As clearly indicated from the transcript, Breland cited Rule 404 as legal authority, which allowed him to ask Joseph about his felony conviction.

¶34.    As stated, at trial, Breland argued Mississippi Rule of Evidence 404 supported his

position and that Joseph's crime was one of "moral turpitude."[6] Although Breland cited Rule 404 to the trial court, he offered no evidence or argument as to how Rule 404 applied. Under Rule 404(b), general character evidence of a "crime, wrong, or other act" is not admissible to prove a person's character, unless offered pursuant to an exception under Rule 404(b)(2). The exceptions listed include "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." M.R.E. 404(b)(2). Breland did not argue to the trial court that any of those exceptions applied.[7] An appellant cannot put the trial court in error for something that was never argued to the trial court. *Edwards v. Thigpen*, 433 So. 2d 906, 909 (Miss. 1983) ("[T]he trial court will not be held in error for overruling an objection which is couched in such broad terms as to insufficiently put the trial court on notice as to precisely what error is being alleged."). Therefore, this issue is without merit.

## CONCLUSION

¶35. Upon review of the record, this Court finds that the court did not err in denying Breland's motion challenging the court's jurisdiction. Further, Joseph is entitled to damages for the cutting of timber. Finally, the trial court did not err in prohibiting Breland from using Joseph's prior conviction to question his credibility.

¶36. **AFFIRMED.**

**BARNES, C.J., GREENLEE, WESTBROOKS, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND**

---

[6] Breland never cited Mississippi Rule of Evidence 609 to the trial court or in his appellate brief to this Court.

[7] Additionally, Breland did not object when Joseph testified about the price he sold his land for during direct examination.

**IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON, P.J., NOT PARTICIPATING.**