# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-01641-COA

**IN RE ESTATE OF HARRY J. GREEN,**                      **APPELLANT**
**DECEASED: ELIDE CRISTINA GARRIDO**
**GREEN**

**v.**

**SHIRLEY COOLEY AND WILFORD GREEN**             **APPELLEES**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/11/2018 |
| TRIAL JUDGE: | HON. C. MICHAEL MALSKI |
| COURT FROM WHICH APPEALED: | LEE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | MARK NOLAN HALBERT |
| | CYNTHIA TRANELL LEE |
| ATTORNEY FOR APPELLEES: | CHRISTOPHER G. EVANS |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED - 09/10/2019; CORRECTED 09/26/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE CARLTON, P.J., LAWRENCE AND C. WILSON, JJ.

### LAWRENCE, J., FOR THE COURT:

¶1. Cristina Green appeals the decision of the Lee County Chancery Court to award eight of her late husband's properties to his sister, Shirley Cooley. The chancery court found that Harry Green delivered the December 31, 2003 deeds to Shirley, and that Harry intended that Shirley own the properties in question. We affirm.

### FACTS

¶2. During his lifetime, Harry amassed a large estate consisting of various properties. On December 31, 2003, Harry had his attorney draft eight deeds that conveyed the following

properties to his sister Shirley:

1. 1201 Nixon Drive, Tupelo, MS

2. The "Main Street Warehouse," Shannon, MS

3. The Monroe County Land, Nettleton, MS

4. The "Shannon Lot"

5. Temple Circle, Shannon, MS

6. The "White Lane Property," Nettleton, MS

7. The "Two Houses and Green Valley Lab," Shannon, MS

8. The Summit[1]

Shirley was not present when these deeds were signed. In fact, both parties agree that she was at her home in Texas at that time. Further, there is no indication in the record that she ever knew the transaction occurred in December 2003. After the deeds were properly acknowledged before a notary public, Harry took the deeds with him for safe keeping. Harry did not deliver the deeds to Shirley at that time, nor did he file them in the county clerk's

---

[1] The Summit property is not considered in this appeal. At trial, Shirley testified that she signed a deed that transferred the Summit property back to Harry twice. She first signed a deed on January 15, 2004. Years later, in 2009, however, Harry came back to Shirley and told her she needed to re-convey the property because he wanted to get a "homestead exemption," and build a home for him and Cristina. Because the Summit property was in Harry's name at the time of his death, it passed to Cristina and was not at issue at the trial level. The chancellor, however, took this as a sign of Harry's intent. Mainly, the chancellor concluded that if Harry wanted the other properties in his name, he would have asked Shirley to sign the deeds and record them like he did with the Summit property.

office.[2]

¶3.     Later, on January 15, 2004, Shirley was visiting Harry and their mother in Mississippi. Harry asked Shirley to go with him to his attorney's office in Houston, Mississippi to sign some papers.  Shirley testified that she signed "everything that was put in front of [her]." The record indicates that Shirley signed the following warranty deeds on January 15, 2004: (1) 1201 Nixon Drive; (2) the Main Street Warehouse; (3) the Monroe County Land; (4) the Shannon Lot; (5) Temple Circle; and (6) the Beauty Shop and House in Monroe County. Shirley told the chancellor that Harry did not tell her anything about why he wanted her to sign the deeds, but that she just trusted Harry.  The warranty deeds signed on January 15 were never properly acknowledged or filed.  Harry took the deeds with him when he left, and those deeds were never found.[3]

¶4.     Harry met Cristina in 2003.  On January 31, 2004, Harry married Cristina in Las Vegas.  Cristina testified at trial that Harry "never told [her]" that Shirley owned any of his properties, including the home on Nixon Drive that the newlyweds were living in.  Likewise, Cristina testified that her husband kept his business affairs secret.  However, Lisa Diallo, a deputy clerk for Lee County, testified that Harry told her his properties were in Shirley's name because he trusted her and his "wife [was] from across the water," and he did not want

---

[2] The December 31, 2003 deeds signed by Harry to Shirley were later filed in the Lee County Chancery Clerk's office on December 4, 2004, and were delivered to Shirley by Harry that same month.

[3] Copies of the signed, non-acknowledged, unfiled deeds were later found in the attorney's office, but the original deeds Harry took with him were never found.

her to take the property. The chancellor specifically cited this fact in his opinion.

¶5. On November 26, 2004, Harry conveyed by quitclaim deed the ninth property, the Plantersville property, to Shirley. Like the deeds signed on December 31, 2003, Shirley was not present and the deed was properly acknowledged. A few days later, on December 3, 2004, Harry traveled to Texas and delivered all of the December 31, 2003 warranty deeds and the November 26, 2004 quitclaim deed to Shirley. Shirley testified that she "put the deeds away," and that Harry told her that if something happened to him, she would "know what to do." The December 31, 2003 deeds were recorded on December 4, 2004, except for the Monroe County properties (the White Lane property and the Monroe County land). Shirley actually filed the White Lane property and the Monroe County land warranty deeds after Harry's death in 2010.

¶6. Harry continued to pay taxes on the properties, do routine maintenance, and collect rent. When Harry went to borrow money against the Plantersville property in 2010, however, he asked Shirley to sign the papers required to do so. Shirley testified that Harry had also borrowed against the home at 1201 Nixon Drive twice before. These transactions also required her signature for approval. The chancellor's opinion noted these facts to support his factual determination that Harry intended to transfer the properties to his sister instead of Cristina.

¶7. Harry died on July 6, 2010. In 2007, Harry had updated his will to devise all of his property to his wife Cristina and his grandchildren. The property listed in the will included

the properties Harry deeded to Shirley on December 31, 2003. Because Shirley took control of the properties after Harry's death, Cristina filed a complaint for an accounting of the estate and a declaratory judgment as to the owner of the property at issue. Cristina argued that the deeds signed on January 15, 2004, were properly accepted by Harry, and the properties were to pass as dictated by Harry's will. The estate was never able to find the unacknowledged original deeds signed on January 15, 2004, and those deeds were never filed in the land records or the clerk's office. Copies of the deeds signed that day were retrieved from Harry's attorney, but there is no record of Shirley ever signing a deed to convey the "Two Houses and Green Valley Lab" back to Harry.

¶8. The chancellor found that, after reviewing all of Harry's actions, he intended for Shirley to possess the properties. As a result, the court found that Shirley was the rightful owner of the eight properties in dispute.[4] Cristina timely appealed the chancellor's decision.

## STANDARD OF REVIEW

¶9. Our review of the chancellor's decision is limited. The findings of a chancery court will not be disturbed "unless [it] abused its discretion, applied an erroneous legal standard,

---

[4] In the chancellor's original memorandum opinion and judgment filed on November 7, 2017, he found that Shirley was the rightful owner of six properties conveyed on December 31, 2003 (1201 Nixon Avenue, the White Lane property in Monroe County, the Main Street Warehouse in Shannon, the Monroe County land, Temple Circle, and the Shannon Lot). Later, on February 21, 2018, the chancellor entered an order clarifying his memorandum opinion and judgment. In his clarifying order, the chancellor found that the Green Valley Lab property belonged to Shirley. Additionally, he found that Shirley owned the house and 9.5 acres in Plantersville. At the time of this appeal, Shirley was adjudged to be the rightful owner of all eight properties.

or its findings are manifestly wrong or clearly erroneous." *Matter of Estate of Smith v. Boolos*, 204 So. 3d 291, 305 (¶22) (Miss. 2016) (citing *In re Estate of Baumgardner*, 82 So. 3d 592, 598 (¶15) (Miss. 2012)).  Questions of law, and issues of constructive trusts, we review de novo. *Id.*

## ANALYSIS

¶10.   Cristina argues three issues on appeal.  Because her first two issues deal with acceptance and delivery of the deeds signed on January 15, 2004, we consider them as one issue. First, Cristina claims that the chancellor erred in awarding the six properties to Shirley because Harry had properly accepted the deeds signed on January 15, 2004.  Second, she argues a constructive trust was created when Shirley took possession of the properties, and the properties should have been distributed as dictated in Harry's will.

¶11.   The laws of this state concerning the validity of deeds and the transfer of real property are well settled.  For there to be a valid conveyance of real property, there must be delivery and acceptance of a valid deed. *In re Estate of Hardy*, 910 So. 2d 1052, 1054 (¶7) (Miss. 2005).  Delivery constitutes a "transfer of a deed from the grantor to the grantee or his agent or to some third person for the grantee's use, in such manner as to deprive the grantor of the right to recall it at his option, and with intent to convey title." *Id*. at 1054-55 (¶8) (quoting 23 Am. Jur. 2d *Deeds* §120, at 156 (1983)).  Before delivery is complete, "a deed is without force or effect and is merely a 'scroll under control of the grantor who is free to withdraw it, destroy it, or complete its execution by delivery.'" *Morrow v. Morrow*, 129 So. 3d 142,

146 (¶13) (Miss. 2013). The Mississippi Supreme Court has found that a deed that was signed and acknowledged, but never delivered, was void for lack of delivery. *In re Estate of Hardy*, 910 So. 2d at 1055 (¶8) (citing *Grubbs v. Everett*, 236 Miss. 698, 701, 111 So. 2d 923, 924 (1959)).

¶12. Cristina claims that the chancellor erred in awarding the six properties to Shirley because Harry had properly accepted the deeds signed on January 15, 2004. She argues that Harry's actions leading up to the conveyance on January 15, 2004 showed his intent was always for the properties to return to him. Harry had the deeds that conveyed the properties from him to Shirley (signed on December 31, 2003) and the deeds that transferred them back (signed on January 15, 2004) drafted at the same time. Additionally, the short period of time between the conveyances, Cristina argues, makes it clear that Shirley was not the intended owner. The chancellor disagreed, and found that Harry's actions indicated he wanted Shirley to own the properties at issue.

¶13. The chancellor factually found, after considering the evidence presented at trial, that Harry intended the properties in question to be transferred to Shirley and that Harry did not accept the January 2004 deeds. We are bound to affirm that factual finding unless it was manifestly in error or clearly erroneous. Here, ample evidence supports the chancellor's finding. The chancellor's decision was based on "Harry's words, acts[,] and the circumstances surrounding the transaction." From that, the chancellor determined Harry "did not intend to, and thus did not accept, the conveyance" of the properties in January 2004,

7

when Shirley executed the deeds. We agree. Cristina testified at trial that she overheard her husband discuss that he was renting their home at 1201 Nixon Drive with his secretary:

Q.      -- y'all were renting the Nixon home

A.      Yeah . . . .

That was during the time that Shirley was the owner of record of the 1201 Nixon Drive property. Further, testimony proved that Shirley signed for deeds of trust as the owner of the properties, and Shirley re-signed the deed to the Summit property after she had signed it previously on January 15. In addition, the chancellor heard testimony that the deeds Harry ultimately delivered to Shirley were the warranty deeds he signed on December 31, 2003. The January 15, 2004 deeds were never filed and were, in fact, never found. The chancellor recognized "one of several possibilities for the disappearance of the deeds is that Harry destroyed them," and took that fact to signify that he never accepted the deeds. We agree.

¶14.    Further, Harry's knowledge and actions evidence his non-acceptance of the deeds signed in January 2004. Harry knew what he was doing. It is hard to comprehend that Harry would deliver and record the December 2003 deeds in December 2004 if his intended result was to vest title back to himself because of the January 2004 deeds that were never found. In fact, it is impossible to imagine that Harry was not aware of each step in these transactions, when he orchestrated and caused every move. At the time, Harry was acting as both grantor and grantee over the course of these transactions and had full knowledge of the actual ownership interest of all parties. The chancellor even noted in his opinion that

8

"despite his experience in matters of real estate and his prior conduct," Harry chose not to have the January 2004 deeds notarized, filed, or found. This indicated that Harry's intent was for Shirley to remain the owner of the properties and Harry's non-acceptance of the January 2004 deeds.

¶15. The chancellor's findings of fact as to Harry's intent are supported by the evidence. The law requiring delivery and acceptance before a conveyance is legally effective supports the chancellor's conclusions. All of these facts, coupled with the additional testimony and evidence at trial, support the chancellor's factual findings and conclusion of law and do not rise to the level of clear or manifest error. We affirm the chancellor's finding that Harry did not accept the deeds in January 2004.

¶16. Cristina's second issue argues that the properties were held in a constructive trust. "A constructive trust is a judicially imposed remedy used to prevent unjust enrichment when one party wrongfully retains title to property." *Presbytery of St. Andrew v. First Presbyterian Church PCUSA of Starkville*, 240 So. 3d 399, 405 (¶27) (Miss. 2018). If Shirley had wrongfully retained title to the properties, then a constructive trust may be necessary. However, as the chancellor found in his opinion, Shirley is the rightful owner of all eight of the properties. This Courts affirms the chancellor's finding that the deeds signed in December 2003 and again in January 2004 (1201 Nixon Drive, the "Main Street Warehouse," the "Shannon Lot," "Temple Circle," the "Monroe County Land," and the beauty shop, house, and acreage in Nettleton) were all rightfully Shirley's. As such, a constructive trust

is not proper because Shirley did not "wrongfully retain[] title to [the] propert[ies]." As to the Green Valley Lab and Plantersville properties, we find the same. Nothing in the record indicates that a signed deed conveying the Green Valley Lab from Shirley to Harry was ever found. There was a unsigned copy, but neither Cristina nor Harry's attorney could produce a signed copy. Additionally, there is no evidence that a deed was ever found that would have conveyed the Plantersville property back to Harry. So, again, these two properties would not require a constructive trust. We find that the chancellor did not err by finding Cristina failed to prove her claim of a constructive trust.

**CONCLUSION**

¶17.    This Court affirms the chancellor's finding that Shirley Cooley is the rightful owner of the following properties:

1.    1201 Nixon Drive, Tupelo, MS

2.    The "Main Street Warehouse," Shannon, MS

3.    The Monroe County Land, Nettleton, MS

4.    The "Shannon Lot"

5.    Temple Circle, Shannon, MS

6.    The "White Lane Property," Nettleton, MS

7.    The "Two Houses and Green Valley Lab," Shannon, MS

8.    The Plantersville Property

The record supports the chancellor's conclusion that Harry's actions between December 2003

10

and December 2004 show his intent that Shirley remain the owner of these properties. While this Court cannot speak to Harry's reasons for masterminding these transfers like a game of Monopoly, Harry's actions in this case speak louder than his words. Harry failed to properly accept the deeds signed by Shirley on January 16, 2004, because he never filed the deeds and the signed originals were never found after his death, even though the deeds were in his exclusive control. Accordingly, we find no manifest error in the chancellor's decision and affirm the decision that the properties belong to Shirley. Furthermore, because Shirley does not wrongfully possess title to the properties, a constructive trust as to any of the eight properties is unnecessary and the chancellor was correct in denying her request.

¶18.  **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, McCARTY AND C. WILSON, JJ., CONCUR. J. WILSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY TINDELL, J.**

**J. WILSON, P.J., DISSENTING:**

¶19.  This dissent primarily addresses six of the eight properties that are at issue in this appeal.[5] There is no dispute that Shirley signed warranty deeds reconveying those six properties to Harry. There is also no dispute that Shirley signed those deeds at Harry's lawyer's office at Harry's specific request. And there is no dispute that Harry took

---

[5] The other two properties—(1) the "Two Houses and Green Valley Lab" in Shannon and (2) a house and nine and a half acres in Plantersville—raise different issues because there is no evidence that Shirley signed deeds reconveying them to Harry. I address those two properties in Part II.

possession of the deeds, continued to pay insurance and taxes on the properties for the rest of his life, and continued to make improvements and repairs and collect rents on the properties. The chancellor nonetheless found that Harry did not "accept" the deeds to these properties. I respectfully disagree with the chancellor's conclusion. I would reverse and render judgment in favor of Cristina as to these six properties.

### I. The January 15, 2004 Warranty Deeds

¶20. With respect to six of the properties at issue in this appeal, there is no dispute (a) that Harry signed deeds conveying the properties to Shirley on December 31, 2003, and (b) that Shirley then signed warranty deeds reconveying the properties to Harry on January 15, 2004. These include four properties in Lee County and two in Monroe County:

1. 1201 Nixon Drive in the Lee Acres subdivision in Tupelo (Lee County) (Exhibits 1-A and 1-B);

2. the "Main Street Warehouse" in Shannon (Lee County) (Exhibits 2-A and 2-B);

3. the "Shannon Lot" in Shannon (Lee County) (Exhibits 4-A and 4-B);

4. "Temple Circle" in Shannon (Lee County) (Exhibits 5-A and 5-B);

5. "Monroe County Land" in or around Nettleton (Monroe County) (Exhibits 3-A and 3-B); and

6. a beauty shop, house, and acreage at 30023 White Lane in Nettleton (Monroe County) (Exhibits 6-A and 6-B).

Shirley signed the six deeds reconveying the properties to Harry at Harry's specific request at the office of Harry's lawyer, John Fox.

12

¶21. The December 31, 2003 deeds for the four Lee County properties were not recorded until December 4, 2004. The December 31, 2003 deeds for the two Monroe County properties were not recorded until after Harry's death. On July 29, 2010, about three weeks after Harry died, Shirley recorded those two deeds in Monroe County. The January 15, 2004 deeds reconveying the six properties from Shirley to Harry were never recorded.

¶22. Although the deeds reconveying the properties from Shirley to Harry were neither acknowledged nor recorded, that does not affect their validity as between Shirley and Harry or their heirs. Miss. Code Ann. § 89-5-3 (Supp. 2018) (providing that a deed "shall . . . be valid and binding" "as between the parties and their heirs" even if it is not acknowledged or recorded); *Assocs. Fin. Servs. Co. of Miss. v. Bennett*, 611 So. 2d 973, 976 (Miss. 1992); *Cotton v. McConnell*, 435 So. 2d 683, 687 (Miss. 1983); *Metro. Nat'l Bank v. United States*, 901 F.2d 1297, 1302 n.2 (5th Cir. 1990). The chancellor recognized this point in his order denying summary judgment, and Shirley does not dispute it on appeal. The chancellor correctly stated that the "one central question remaining in this cause" is "whether Harry accepted the six deeds on January 15, 2004."

¶23. "[A]cceptance by the grantee [is] essential to the validity of a deed." *Odom v. Forbes*, 500 So. 2d 997, 1001 (Miss. 1987). The grantee's intent to accept the deed is "manifested by his words, acts and the circumstances surrounding the transaction." *Id.* The chancellor in this case noted that Mississippi case law addressing the grantee's intent to accept a deed is "sparse."

13

¶24.    In *Martin v. Adams*, 216 Miss. 270, 62 So. 2d 328 (1953), the Court held that the grantee, Mrs. Adams, did not accept a deed from the grantor, her husband. When Mr. Adams told his wife that he had executed a deed conveying certain land to her, she "immediately declined to accept the deed, and remonstrated with him for what he had done." *Id.* at 277, 62 So. 2d at 329. She "took the deed to an attorney for his interpretation of it," but the deed was then "returned to [Mr. Adams] and remained in his control." *Id.* at 277-78, 62 So. 2d at 329. The Court held that the deed was void due to Mrs. Adams's express refusal to accept it. *Id.*

¶25.    The Court also held that deeds were not accepted in *In re Estate of Hardy*, 910 So. 2d 1052, 1054-55 (¶¶7-10) (Miss. 2005). In that case, Hardy executed deeds conveying property to her three daughters, but she died before she delivered the deeds. *Id.* at 1055 (¶9). The deeds were found in her purse after her death, and "each of [her daughters] testified unequivocally that she never accepted the deed." *Id.* Thus, the problem in *Hardy* was not just that the deeds were not "accepted" but that they were not even delivered. *Id.* at (¶10).

¶26.    In *Salmon v. Thompson*, 391 So. 2d 984 (Miss. 1980), the Court held that a deed was not accepted because the offeree failed to pay the purchase price for the property. Salmon orally agreed to buy 55 acres from Thompson for a specified price. *Id.* at 985. Six months later, Thompson wrote to Salmon. *Id.* He enclosed an executed deed and instructed Salmon to return a copy of the deed with a check for the purchase price if he still wanted to buy the property. *Id.* For more than two years thereafter, Salmon did not pay for the property or

14

record the deed, and Thompson finally informed Salmon that he was selling the land to another party. *Id.* at 985-86. Salmon then attempted to record the deed and pay for the property. *Id.* However, the Court held that Thompson had withdrawn the offer to sell before Salmon accepted the deed. *Id.* at 987. The Court held that Thompson's initial "letter with instructions . . . constituted a qualified delivery of the deed," but Salmon failed to accept the deed when he failed to comply with those instructions for more than two years. *Id.*

¶27. In each of the foregoing cases, the evidence that the grantee did not accept the deed was clear. There is no similarly clear evidence of non-acceptance in this case. In fact, there is ample evidence that Harry did accept the deeds. There is no dispute that Harry asked Shirley to go to the Fox law office and sign the deeds reconveying the properties to him. There is also no dispute that Harry took possession of the deeds and left the Fox law office with them. Harry then continued to pay the taxes and insurance on the properties, continued to make repairs and improvements on the properties, and continued to collect rent on the properties. In addition, more than three years later, Harry had a new will prepared in which he specifically devised at least some of the properties at issue. He specifically devised the "White Lane" property in Nettleton to his grandchildren, and he devised "[t]he Green real estate apartments and houses" to Cristina.[6] In a residual clause, Harry devised all of his

---

[6] The precise nature of all six of the properties is not clear from the record; however, at least some of them are rental properties that appear to fall within this devise. Shirley acknowledged at trial that she changed the locks on the properties and began collecting rent on the properties after Harry's death.

remaining real property to Cristina. Harry also borrowed money against the Nixon Drive property and used the funds to build a new marital home on another of his properties. In short, with respect to these six properties, Harry exercised the ordinary rights and fulfilled the ordinary obligations of property ownership. As the chancellor put it, "Harry's day-to-day behavior with regard to the property was consistent with ownership."

¶28. The evidence that Shirley cites does not demonstrate a lack of acceptance. Shirley emphasizes that Harry never had the deeds notarized and filed. However, as discussed above, that does not render the deeds invalid as between the parties or their heirs.[7] Shirley also notes that Harry asked her to sign deeds of trust for the Nixon Drive property. However, it is hardly surprising that the bank wanted Shirley—the record owner of the property—to sign the deed of trust. Shirley next points out that Harry frequently reviewed the properties under her name at the Lee County chancery clerk's office. However, that simply shows that Harry knew that the Lee County land records showed that Shirley was the owner of record, which is not in dispute.

¶29. Shirley also relies on Cristina's inability to produce the original signed deeds that Harry took with him from the Fox law office. Shirley speculates that Harry may have lost

---

[7] Moreover, as noted above, with respect to the two Monroe County properties, neither the December 31, 2003 deeds from Harry to Shirley nor the January 15, 2004 deeds from Shirley to Harry were recorded prior to Harry's death. It was only after Harry died that Shirley recorded her deeds. It is unclear why Shirley's unilateral action after Harry's death should make those deeds more valid than the deeds that Shirley signed to reconvey the same properties to Harry.

or destroyed the originals. However, even if that is what happened, the subsequent loss or destruction of the originals would not render Harry's acceptance of the deeds invalid. *See Wood v. Johnson*, 234 Miss. 874, 880, 108 So. 2d 202, 204 (1959) ("The rule has generally been adhered to in this jurisdiction that where a deed has once been signed and delivered, a subsequent surrender and destruction of it does not divest the grantee of title to the land."); *Lisloff v. Hart*, 25 Miss. 245, 250 (1852) ("The deed made to the son by Hanah vested the title to the land in him, and the subsequent destruction of it did not divest it. The second deed, made by Hanah to Charles Lisloff, Sen., is inoperative, and cannot defeat the right of the son to the premises."). The relevant issue is whether Harry accepted the deeds when they were executed and delivered to him in January 2004—not what he may have done with them sometime later.

¶30. Shirley also cites vague testimony of her brother, Wilford Green, that Harry and Cristina wrote a number of "rent" checks to Larry Williams for "around $500" while the couple resided on Nixon Drive. Wilford said that Williams was a "friend" of theirs. Shirley suggests that Harry would not have paid "rent" to a "third party" if he really owned the Nixon Drive property. The suggestion makes no sense. To begin with, Wilford had little knowledge of the checks and did not clearly testify that they were rental payments for the Nixon Drive home. Beyond that, there is no evidence that Larry Williams owned the property or that he was collecting rent on behalf Shirley. It is Shirley's position in this litigation that *she* owned the Nixon Drive property at that time. Yet Shirley fails to explain

17

why Harry would have been paying rent to Larry Williams or how that would tend to prove that she owned the property. Is Shirley suggesting that Harry mistakenly believed that his friend Larry Williams owned the property? And, if so, what would that prove?[8]

¶31. Finally, the chancellor found it significant that Harry had Shirley execute two deeds reconveying the marital home in "The Summit" subdivision in Tupelo. The Summit property is not at issue in this appeal because Shirley does not dispute that Cristina is its rightful owner. Like the six properties discussed above, Harry signed a deed conveying the Summit property to Shirley on December 31, 2003, and Shirley then signed a deed conveying the property back to Harry on January 15, 2004, although the latter deed was never recorded. In 2009, Harry asked Shirley to execute a second deed conveying the Summit property to him so that he could file for a homestead exemption on the property. Shirley complied, and that deed was both acknowledged and recorded. The chancellor suggested that the 2009 deed "may have been unnecessary if Harry had truly accepted the 2004 conveyance." However, the much simpler explanation for Harry's request for a second deed is just what he told

---

[8] The majority opinion quotes a snippet of Cristina's testimony to make it appear that Cristina admitted that she and her husband were renting the Nixon Drive home. *Ante* at ¶13. Cristina, who is from Venezuela, apologized during her testimony that her "English is so bad." She also testified that she and Harry did not pay rent for the property and that they did not have a landlord. All that she clearly articulated was that she once overheard Harry make some unspecified comment to his secretary about renting the property. Furthermore, the majority also fails to explain why Harry or Cristina would have been paying rent to *Larry Williams* if, as the majority contends, *Shirley* owned the property.

18

Shirley: he needed an acknowledged, recorded deed to file for his homestead exemption.[9] Harry's request regarding the Summit property should not be interpreted as evidence of what he did or did not believe about the six other properties.

¶32.    In summary, the chancellor was entirely correct in finding that "Harry's day-to-day behavior with regard to the property was consistent with ownership." Harry asked Shirley to sign deeds reconveying the properties to him, and he took possession of those deeds. He also paid the taxes and insurance on the properties, he made improvements and repairs, he collected rent, and he even devised the properties in his will. The various other pieces of evidence cited by Shirley do not prove a lack of acceptance. Because Harry accepted the deeds, I would reverse and render judgment in favor of Cristina.

## II.    Constructive Trust

¶33.    Cristina's complaint sought a constructive trust as to all eight properties that are in dispute in this appeal. As to the six properties discussed above in Part I, Cristina makes an in-the-alternative argument that, "[t]o the extent there is any question concerning [Harry's] acceptance of the six signed deeds, [the] evidence is sufficient to establish a constructive trust as to the properties." Cristina also argues that a constructive trust should be imposed

---

[9] *See* Miss. Code Ann. § 27-33-17(f) (Rev. 2017) ("If title is held by deed . . . , such instrument shall be dated and acknowledged on or before January 1 of the year for which homestead exemption is applied and shall be filed for record with the chancery clerk on or before January 7 of the year for which homestead exemption is applied . . . ."); Miss. Code Ann. § 89-3-1 (Supp. 2018) ("Unless [a deed] is [properly] acknowledged . . . , the [chancery clerk] may refuse to [record the deed].").

on two additional properties: (1) the "Two Houses and Green Valley Lab" in Shannon and (2) a house and nine and a half acres in Plantersville. There are no deeds to show that Shirley ever conveyed these properties back to Harry; however, Cristina argues that Shirley held the properties "solely for the benefit of Harry."

¶34. A constructive trust is an equitable claim *against* a party who holds legal title to a property. *Joel v. Joel*, 43 So. 3d 424, 431 (¶23) (Miss. 2010); *McNeil v. Hester*, 753 So. 2d 1057, 1064 (¶24) (Miss. 2000). Therefore, the majority's determination that Shirley has title to the six properties discussed above in Part I does not defeat Cristina's claim for a constructive trust. Nor is Cristina's lack of deeds for the other two properties dispositive with respect to those two properties.

¶35. I would not address Cristina's claim for a constructive trust as to the six properties discussed above in Part I only because I would hold that the January 15, 2004 warranty deeds from Shirley to Harry were valid and effectively conveyed title to the properties. Therefore, a constructive trust should be unnecessary as to those properties.

¶36. As to the remaining two properties—the Two Houses and Green Valley Lab and the Plantersville property—I would affirm the chancellor's denial of a constructive trust.[10] Unlike the six properties discussed above, there is no evidence that Shirley signed a warranty deed conveying either of those properties back to Harry. Although there is some evidence

---

[10] The Supreme Court's decision in *Joel*, 43 So. 3d at 430-31 (¶¶22-24), summarizes the basics of the law on constructive trusts.

to support Cristina's claim that Shirley held the properties solely for Harry's benefit, the evidence is also open to other interpretations. I cannot say that the chancellor clearly erred by finding that Cristina failed to meet her burden of proving this claim by clear and convincing evidence.

## CONCLUSION

¶37. I would affirm the denial of Cristina's claim for a constructive trust with respect to the Two Houses and Green Valley Lab and the Plantersville property. However, with respect to the six properties discussed in Part I, I would hold that the evidence is open to only one interpretation: Harry accepted the signed warranty deeds reconveying the properties to him. Therefore, those deeds were valid and effective, and I would reverse and render as to those six properties. I respectfully dissent.

**TINDELL, J., JOINS THIS OPINION.**