# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-CA-00423-SCT

***IN RE THE ESTATE OF EDWIN LEA BRENT,
DECEASED: DR. SUSANNAH BRENT MAYS,
SPECIAL ADMINISTRATOR OF THE ESTATE
OF EDWIN LEA BRENT***

***v.***

***THE ESTATE OF ANN BRENT***

| | |
|---|---|
| DATE OF JUDGMENT: | 08/31/2022 |
| TRIAL JUDGE: | HON. BENNIE LE NARD RICHARD |
| TRIAL COURT ATTORNEYS: | JOEL J. HENDERSON |
| | DAVID SCOTT MAYS |
| | NICK CRAWFORD |
| | R. BRITTAIN VIRDEN |
| | EDWARD D. LAMAR |
| | WALTER ALAN DAVIS |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JOHN S. GRANT, IV |
| ATTORNEY FOR APPELLEE: | R. BRITTAIN VIRDEN |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | REVERSED AND RENDERED - 06/05/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE RANDOLPH, C.J., ISHEE AND GRIFFIS, JJ.**

**ISHEE, JUSTICE, FOR THE COURT:**

¶1. This estate case involves a probate claim for unpaid alimony. In short, the estates of Ann Brent and Lea Brent disagree over whether Ann's Estate can recover from Lea's Estate permanent periodic alimony Lea failed to pay his ex-wife Ann prior to her death. The Washington County Chancery Court sided with Ann's Estate and awarded it $139,104—the total amount of alimony Lea owed Ann between July 2014 and November 2015, plus 8

percent interest per annum for eight years and two months. The chancellor erred, however, by denying Lea's Estate credit (1) for partial alimony payments totaling $51,000 Lea made to Ann between July 2014 and November 2015 and (2) for a $75,143.28 life-insurance proceeds payment Lea made to Ann's Estate in March 2019. Because the total amount of credit exceeds the total amount owed for the relevant period, thereby leaving no unpaid alimony to award Ann's Estate, we reverse the chancellor's decision and render judgment in favor of Lea's Estate.

## FACTS AND PROCEDURAL HISTORY

¶2. Lea and Ann married on April 24, 1953, and divorced on September 21, 1983. According to their property settlement agreement (PSA), incorporated into the divorce decree, Lea agreed to pay Ann $5,600 on the tenth day of each month in permanent periodic alimony. The guaranteed minimum monthly alimony amount was to be paid until Ann remarried or until her death. Ann died on November 27, 2015, having never remarried. According to Lea's tax returns, he began paying Ann less than the required amount in 2002, but no modification action was ever filed. Further, Ann never filed a contempt action against Lea for nonpayment of alimony based on a violation of their PSA.

¶3. The PSA also required Lea to acquire a term life-insurance policy for himself before the entry of the divorce decree. The PSA specified that the policy amount had to be at least $500,000 and required that the funds from the policy be placed into a trust upon Lea's death. The PSA additionally stated that "the income from said trust shall be paid periodically but in no event less than annually to [Ann] during her lifetime and regardless of her re-marriage

2

at the discretion of the trustee." Lea accordingly obtained a policy from Manhattan Life Insurance.

¶4.     Lea and Ann had five children together: Collins, Margaret, Jesse, Belinda, and Ruth Ann. Collins became the power of attorney for Ann on July 31, 2014. When Ann passed away, she left her entire estate to her five children in her last will and testament. She also named Collins as executor of her estate. After his divorce from Ann in 1983, Lea remarried and had another child, Susannah, who, along with his five children from Ann, were the beneficiaries of his estate in his last will and testament. Lea named Collins and David Mays, Susannah's husband, as coexecutors of his estate. Lea died on January 10, 2021.

¶5.     On July 2, 2021, Collins, as executor of Ann's Estate, filed a Notice of Probate Claim against the Estate of Lea Brent for unpaid alimony that Lea failed to pay Ann prior to her death, in the total amount of $358,700. The deficient alimony payments spanned from 2002 to 2015. After Collins filed the probate claim, he realized a conflict existed because he served as an executor for both estates. Thus, Jesse Brent, Ann's other son, was appointed substitute executor of Ann's Estate in place of Collins, and Collins remained coexecutor of Lea's Estate. On April 14, 2022, David Mays filed an objection to the probate claim as coexecutor of Lea's Estate. Mays also filed discovery requests, including various motions to compel discovery, against Ann's Estate.

¶6.     The chancery court held an evidentiary hearing on August 9, 2022. Jesse testified that the family was aware Lea was only making partial alimony payments to Ann for years prior to her death. Jesse also testified that the divorce decree provided Ann $5,600 a month but

that Lea had started paying her $3,000 a month starting in 2004. When asked why his mother never took legal action for the deficient payments, Jesse stated that he did not know, but he thought she wanted to avoid the "contention" that the divorce wrought.

¶7.     Lea's tax returns from 2001 to 2015 were admitted into evidence during Jesse's testimony. The tax returns showed Lea applied for tax deductions in the amount of $67,200 in 2001, which was the annual total for the minimum monthly payments of $5,600. In 2002, Lea's tax returns show he reduced the alimony and continued lowering the total paid through 2005, 2006, and 2007. In 2006 and 2007, Lea reportedly paid $2,000 a month in alimony—less than half the required amount. Beginning in 2008, Lea's tax returns stated he only paid $3,000 per month in alimony and consistently deducted an annual total of $36,000 per year on his tax returns from 2008 to 2015.

¶8.     Ann's tax returns from 2008 to 2015 were also admitted into evidence. Most of Ann's tax returns showed alimony income of $36,000 per year, rather than the court-ordered $67,200.[1] The amounts received in 2014 and 2015 were further corroborated with Ann's monthly bank statements from Trustmark Bank, which showed she only deposited $3,000 per month into her personal bank account from Lea until her death in November 2015.

¶9.     Jesse testified the total arrearage owed for unpaid alimony exceeded $600,000 spanning an eleven-year period, including interest. Jesse ultimately agreed, however, that Ann's Estate could only recover unpaid alimony from 2014 and 2015 due to the applicable seven-year statute of limitations. *See* Miss. Code Ann. § 15-1-43 (Rev. 2019) (stating that

---

[1] Although Lea reported in his tax return that he paid Ann $36,000 in alimony in 2015, Ann reported in her tax return that she received $33,000 in alimony in 2015.

4

"[a]ll actions founded on any judgment or decree rendered by any court of record in this state" can be "brought within seven (7) years next after the rendition of such judgment or decree[.]"). Nonetheless, Jesse claimed that Lea's Estate should not receive any credits for payments made during the relevant time period between July 2014 and November 2015 because the arrearage was so large, and Lea never caught up on the payments. Jesse therefore requested that court order Lea's Estate to pay Ann's Estate $159,128, which accounted for the full amount of alimony required but not received between July 2014 and November 2015 ($95,200), plus 8 percent interest compounded annually.[2]

¶10. On cross-examination, Jesse testified that Ann's Estate received approximately $75,000 directly from Manhattan Life Insurance in 2019. Jesse also testified he had no knowledge of any agreement that Lea or Ann may have had regarding the reduced payments since 2004.

¶11. Ann's Estate called Collins as its second witness. When questioned by the court, Collins agreed that the PSA required an insurance policy to cover nonpayment of alimony in the event Lea died before Ann, which did not occur. Notably, the attorney for Ann's Estate argued that the PSA did not contain a provision stating that any proceeds from the

---

[2] At the hearing, Jesse and the chancellor had several exchanges about how Jesse calculated the requested amount. Jesse explained as follows:

> [B]eginning in 2016, we have a beginning balance of what [Lea] owed of $95,200. At eight percent interest, you add [$]7,616 and your ending balance of [$]102,816. Take that balance over to 2017 and then do the same thing for 2018, all the way to today present, the eighth month of 2022, there's eight months in interest so far this year would be $8,057 and so the total amount would be $159,128.

policy were to be used to pay alimony or to serve as a credit toward alimony. Collins testified that his father wanted to cease paying the premium that was on the policy, so he "had the trustees cash that policy out." Collins explained that his father gave him the check from Manhattan Life Insurance in the amount of $75,143.28 (the cash value of the policy). As executor of Ann's Estate, Collins deposited the check into Ann's Estate's bank account on March 14, 2019. Collins testified that he understood the money to be a gift and that his father made no mention of the money being used as an alimony payment.

¶12. Following the hearing, the court entered an Order to Establish Probate Claim finding the probate claim valid. The court based its ruling primarily on the tax returns of Lea and Ann, which showed delinquent alimony payments. The court found, however, that a majority of past-due payments in the 2021 probate claim were barred by the seven-year statute of limitations. Therefore, the court held the only valid claims for past-due alimony were between July 2014 and November 2015. The court denied Lea's request for offset or credit for payments made between July 2014 and November 2015 based on the "significant arrearage" outside of the statute of limitations. Thus, the court determined that the most equitable calculation for the probate claim was $139,104, which accounted for the alimony payments owed between July 2014 and November 2015 ($95,200) and a simple-interest rate of 8 percent per annum. The court further found that Lea's Estate failed to submit sufficient proof to justify an offset or credit based on Lea's payment to Ann's Estate with the money he received after surrendering his life insurance policy.

¶13. Lea's Estate appealed.

6

**STANDARD OF REVIEW**

¶14. When reviewing appeals from chancery court decisions, "we apply a limited standard of review in that the factual findings of the chancery court, if supported by substantial evidence, will not be disturbed unless the chancery court abused its discretion, applied an erroneous legal standard, or its findings are manifestly wrong or clearly erroneous." *Flowers v. Boolos (In re Est. of Smith)*, 204 So. 3d 291, 305 (Miss. 2016) (citing *Arrington v. Ready (In re Est. of Baumgardner)*, 82 So. 3d 592, 598 (Miss. 2012)). We review questions of law, however, de novo. *Id.* (citing *In re Est. of Baumgardner*, 82 So. 3d at 598).

**DISCUSSION**

1.      **Ann's Estate has standing to bring the subject probate claim.**

¶15. Lea's Estate first argues that Ann's heirs lack standing to bring a claim for unpaid alimony. Standing is to be determined at the outset of a lawsuit. *In re Est. of Baumgardner*, 82 So. 3d at 599. Lea's Estate also made this argument in chancery court, but the chancery court effectively found that Ann's Estate did have standing to pursue a claim against Lea for past due and unpaid alimony.

¶16. Our general law on standing is outlined below:

> Our general standing requirement is important to our review of standing issues because it appropriately focuses judicial review on a plaintiff's legal interest and a defendant's legal duty. However, it must be recognized that different standing requirements are accorded to different areas of the law, and an individual's legal interest or entitlement to assert a claim against a defendant must be grounded in some legal right recognized by law, whether by statute or by common law. Quite simply, the issue adjudicated in a standing case is whether the particular plaintiff had a right to judicial enforcement of a legal duty of the defendant or, as stated in *American Book Co. v. Vandiver*, 181 Miss. 518, 178 So. 598 (1938), whether a party plaintiff in an action for legal

7

relief can show in himself a present, existent actionable title or interest, and demonstrate that this right was complete at the time of the institution of the action. *Id.* at 599. "Such is the general rule." *Id.*

*Butler v. Watson (In re Initiative Measure No. 65)*, 338 So. 3d 599, 605 (Miss. 2021) (quoting *City of Picayune v. S. Reg'l Corp.*, 916 So. 2d 510, 526 (Miss. 2005)).

¶17. It is undisputed that Ann's five children are heirs to her Estate. This Court generally recognizes that a decedent's heirs at law have "direct, pecuniary interests [that] will be either detrimentally or advantageously affected by the probate of the will." *Garrett v. Bohannon*, 621 So. 2d 935, 937 (Miss. 1993) (quoting Weems, *Wills and Administration of Estates in Mississippi* § 8-4 (1988)).

¶18. In *Maxcy v. Estate of Maxcy*, 485 So. 2d 1077, 1078 (Miss. 1986), this Court held that the alimony recipient's estate could recover lump-sum alimony from the recipient's ex-husband. As part of the divorce, the ex-husband had agreed to pay $16,000 in alimony, payable in four annual installments of $4,000 each. *Id.* The ex-wife died three and a half months later. *Id.* On appeal, this Court analyzed whether the alimony was lump-sum alimony or periodic alimony. *Id.* This Court ultimately found that alimony was lump-sum alimony and recoverable by the alimony recipient's estate. *Id.*

¶19. Lea's Estate argues that *Maxcy* completely forecloses an alimony recipient's estate from recovering unpaid periodic alimony. But *Maxcy* is distinguishable. *Maxcy* dealt with payments that had not yet become due, as opposed to payments that were past due. Although permanent alimony "terminates upon the death or remarriage of the [spouse,]" money that was owed and not paid during the spouse's lifetime may still be recoverable if the probate

claim falls within the requisite statute of limitations. *Id.* (citing ***Bridges v. Bridges***, 217 So. 2d 281, 283 (Miss. 1968); ***Jenkins v. Jenkins***, 278 So. 2d 446, 449-50 (Miss. 1973)). Regardless of whether Ann had received lump-sum or periodic alimony, she was entitled to those payments during her lifetime and did not receive the contracted amount. Under the PSA, Lea was required to pay Ann $5,600 a month until she remarried or died. It is well-settled that periodic alimony becomes fixed and vested on the date in which the payment is due and unpaid. ***Lewis v. Lewis,*** 586 So. 2d 740, 742 (Miss. 1991); *see also* ***Rubisoff v. Rubisoff***, 133 So. 2d 534 (Miss. 1961). As heirs to Ann's Estate, Ann's five children would have inherited whatever income Ann received, including income from alimony payments. Notably, there is no Mississippi case directly on point in which an alimony recipient's estate has filed a probate claim against either the indebted spouse or the indebted spouse's estate for unpaid periodic alimony.

¶20.   Lea's Estate further claims that Ann's Estate lacks standing because Ann and Lea are both deceased. Mississippi Code Section 91-7-149 provides the procedure for probating claims against an estate. It provides, in relevant part:

> Any person desiring to probate his claim shall present to the clerk the written evidence thereof, if any, or if the claim be a judgment or decree, a duly certified copy thereof, or if there be no written evidence thereof, an itemized account or a statement of the claim in writing, signed by the creditor, and make affidavit to be attached thereto, to the following effect, viz.: That the claim is just, correct, and owing from the deceased; that it is not usurious; that neither the affiant nor any other person has received payment in whole or in part thereof, except such as is credited thereon, if any; and that security has not been received therefore except as stated, if any.

Miss. Code Ann § 91-7-149 (Rev. 2021). Mays, as coexecutor of Lea's Estate, objected to the probate claim pursuant to Mississippi Code Section 91-7-165, which provides:

> The executor or administrator, legatee, heir, or any creditor may contest a claim presented against the estate. The court or clerk may refer the same to auditors, who shall hear and reduce to writing the evidence on both sides, if any be offered, and report their findings with the evidence to the court. Thereupon the court may allow or disallow the claim, but such proceeding shall not be had without notice to the claimant.

Miss. Code Ann. § 91-7-165 (Rev. 2021). We find that Ann's heirs followed the proper procedure in probating their claim against Lea's Estate on behalf of Ann's Estate. And, as previously stated, Ann's heirs have standing to bring this claim because they have a direct financial stake that will be positively or negatively impacted by the probate of the will. *See Garrett*, 621 So. 2d at 937.

¶21. Lea's Estate additionally argues that because Ann never filed a contempt action for Lea's alimony arrearage, Ann's Estate lacks standing to enforce Lea's alimony obligation. Lea's Estate admits, however, that there is no Mississippi law requiring an alimony recipient to bring an contempt action during his or her lifetime in order for the estate to recover past-due payments after his or her death. Lea's Estate instead relies on ***Dodd v. Lovett***, 211 So. 2d 799, 800-02 (Ala. 1968), in which the Alabama Supreme Court held that a deceased former wife's estate could not recover permanent alimony arrearage because the past-due amounts were not reduced to a money judgment during her lifetime. The Alabama Supreme Court, however, appears to have since rejected that proposition, stating, "There is no logical reason for having the judgment of past due installments [such as alimony installments]

10

reduced to a monied judgment. It is already a monied judgment [on the date it becomes due]." ***Moates v. Morgan (Ex parte Morgan)***, 440 So. 2d 1069, 1072 (Ala. 1983).

¶22. Although it may have been prudent for Ann to file a contempt action against Lea, Ann was not required to file such an action to preserve her claim under Mississippi law. Thus, we find that Ann's Estate has standing to bring this probate claim on her behalf.

> **2. The chancery court erred by denying Lea's Estate credit toward the total amount owed during the applicable statute of limitations.**

¶23. Lea's Estate asserts that the chancery court improperly disregarded the statute of limitations in calculating the amount of arrearage owed. Specifically, Lea's Estate claims that the court erred by considering deficient payments for alimony due prior to July 2014 to support its finding that Lea would not receive any credit for partial alimony payments made to Ann between July 2014 and November 2015 because his total arrearage—including the arrearage accrued prior to July 2014—was so "significant."

¶24. The record reveals that Lea began making deficient payments as early as 2002. Indeed, by 2015, Lea was in arrears of more than $350,000 (excluding interest). But Ann had ample opportunity to pursue the unpaid alimony between 2002 and her death in 2015 and, for whatever reason, chose not to do so. The applicable seven-year statute of limitations accordingly bars any claims to unpaid alimony due prior to 2014. Even so, the chancellor found the arrearage from the years outside the statute of limitations negated any credit Lea could have received for the seventeen alimony payments he made to Ann between July 2014 and November 2015.

11

¶25. This finding was an abuse of discretion. Considering the statute of limitations, unpaid alimony from 2002-2013 has no bearing on the time period that falls within the statute of limitations and is the subject of the present claim—July 2014 to November 2015. During that seventeen-month period, Lea consistently paid Ann $3,000 a month, totaling $51,000. But the chancery court's ruling ignores those payments entirely and, with no viable legal justification, forces Lea's Estate to make the payments again. Put simply, Lea made the partial alimony payments. His estate is therefore entitled to credit for them. Further, Ann's Estate should not receive an unjust windfall by recovering from Lea's Estate alimony Lea already paid to Ann during her lifetime. We therefore reverse the chancellor's decision to deny the $51,000 in credit.

¶26. Lea's Estate also claims that the chancery court erred by refusing to give Lea credit toward his arrearage for his $75,143.28 insurance-proceeds payment to Ann's Estate in 2019. Specifically, Lea's Estate claims that, per the PSA, the life-insurance policy served as an alternate form of security for nonpayment of Ann's alimony and that the insurance-proceeds amount Lea paid to Ann's Estate accordingly should have been deducted from the deficient alimony owed for the period between July 2014 and November 2015.

¶27. Denying credit for the insurance-proceeds payment, the chancellor stated in his bench ruling:

> [T]he Court really does not know why [Lea gave Ann's Estate $75,000]. But what the Court is clear about, as I said earlier, Mr. Lea Brent was a sophisticated man who used certified public accountants, who used lawyers, and the Court looks to Mr. Lea Brent's 2019 income tax returns where he did not list his alimony payments at all, much less in the amount of the $75,000 amount given to the Ann Brent trust. So, the Court does not give Mr. Lea

12

Brent's Estate credit for that $75,000 payment. That has not been established to the Court with any credible evidence that that should be an offset or attributable to alimony . . . . I'll note that even if this $75,000 cash surrender given to the Ann Brent trust was arguably for alimony, and that was not established on the record, the Court does not believe or find that that amount would have brought Mr. Lea Brent current given the amount of his back due alimony.[3]

¶28. The chancery court memorialized this ruling in its written order, finding that Lea's Estate failed to present sufficient proof to justify an offset or credit. The court further concluded that, regardless of whether the life-insurance proceeds were an alternate form of alimony payment, the amount paid was "insufficient to satisfy the significant arrearage in light of the final amount of the [p]robate [c]laim."

¶29. We agree with Lea's Estate and find that the chancellor abused his discretion by denying Lea's Estate alimony credit for his 2019 payment to Ann's Estate from his life-insurance proceeds. The PSA expressly establishes that Lea obtained the life-insurance policy solely as an alternate source of alimony that would continue to provide Ann periodic alimony if Lea predeceased Ann. Because Ann predeceased Lea, Lea was not required to pay the life-insurance proceeds to Ann's Estate, but he voluntarily chose to do so after surrendering the policy. And regardless of his motivation for making the payment, he gave the money to Ann's Estate at a time when *he was in debt to that estate*. His payment therefore cannot be viewed as anything other than a payment toward his debt, especially since

---

[3] To support his finding that the life-insurance payment was not intended to cover unpaid alimony, the chancellor relied on the fact that Lea did not list any alimony payments on his 2019 tax return. But the earliest Lea could have listed the March 2019 payment was on his 2020 tax return.

13

he paid Ann's Estate money that he received from an insurance policy obtained to secure Ann's alimony.

¶30. As for the chancellor's citing the total arrearage owed as justification for denying credit, we find that was also error. As previously mentioned, the arrearage was outside of the statute of limitations, and Ann never sought to recover the unpaid amount during her lifetime. For these reasons, we find that the chancellor erred by denying Lea credit for his $75,143.28 payment to Ann's Estate in 2019. We thus reverse the chancellor's decision to deny the $75,143.28 credit.

¶31. Deducting the credit for partial alimony payments Lea made to Ann between July 2014 and November 2015 ($51,000) from the total amount of alimony Lea owed during that period ($95,200), the delinquent amount for the relevant period becomes $44,200. Eight percent interest per annum on that amount through March 2019—the month Lea paid $75,143.28 in life-insurance proceeds to Ann's Estate—amounts to $11,856.[4] Accordingly, the correct unpaid alimony value for the period between July 2014 and November 2015 was $56,056 at the time Lea paid $75,143.28 in life-insurance proceeds to Ann's Estate in March 2019. Because the $75,143.28 payment is credit, as of his payment in March 2019, Lea owed no more alimony for the period between July 2014 and November 2015. To the contrary, as of March 2019, Lea still had $19,087.28 ($75,143.28 in credit minus $56,056 in unpaid alimony) in credit remaining after his delinquent alimony balance for July 2014 to November

---

[4] $44,200 divided by 17 months between July 2014 and November 2015 equals $2,600 in unpaid alimony per month; $2,600 per month x .08 equals $208 in interest per month; 57 months span the period between July 2014 and March 2019; 57 months times $208 in interest per month equals $11,856 in total interest.

2015 was satisfied. We therefore find that Lea's Estate is not obligated to make any additional payment to Ann's Estate.

### 3. Ann's Estate presented sufficient evidence to the chancery court to support its probate claim.

¶32. Lea's Estate claims that Ann's Estate offered insufficient evidence to prove an alimony deficiency. The chancery court chiefly based its ruling on Lea's and Ann's tax returns that evinced delinquent alimony payments from 2002 to 2015. After hearing testimony from several witnesses and reviewing all other evidence presented, the chancery court found that "Lea Brent was a sophisticated business man who routinely utilized accountants and attorneys in his business affairs and the Court sees no reason why Lea Brent would under report alimony payments on his tax returns." We find nothing in the record to contradict or undermine the chancellor's findings of fact. Both Lea's tax returns and Ann's tax returns reflect that Lea consistently underpaid his obligation of $5,600 per month in alimony. Equally important, Lea's Estate failed to provide any evidence challenging the accuracy of either party's tax returns. We therefore find that chancery court did not err by relying on both parties' tax returns to support its finding that Lea only paid Ann $3,000 in alimony between July 2014 and November 2015.

### 4. The chancery court did not err by awarding interest on the unpaid alimony owed.

¶33. Lea's Estate argues that the chancery court erred by awarding interest because the PSA did not provide for any interest. Lea's Estate further argues that chancery court erred in calculating the amount of interest owed. Mississippi law clearly supports the chancery

15

court's decision to award interest on all unpaid amounts owed by the deceased spouse from his estate. *See **Rubisoff***, 133 So. 2d at 537 (holding that alimony payments become vested as they become due and that "each payment bears legal interest from and after its due date . . . ."). Mississippi Code Section 75-17-1(1) states that the legal rate for contracts is 8 percent. Miss. Code Ann. § 75-17-1(1) (Rev. 2016). The chancery court emphasized that it chose the simple interest calculation (as opposed to the requested compound interest) because the court did not believe compound interest was appropriate. The court rightly reasoned that "[t]he needs of the heirs are not greater than a spouse after a divorce."

¶34. In support of its argument, Lea's Estate relies on Mississippi Code Section 75-17-7, which states that "[a]ll judgments or decrees founded on any sale or contract shall bear interest at the same rate as the contract evidencing the debt on which the judgment or decree was rendered." Miss. Code Ann. § 75-17-7 (Rev. 2016). So here, because the PSA did not provide for an interest rate, Lea's Estate argues no interest should be awarded. We find, however, that because the PSA did not provide an interest rate, the chancellor was within his discretion to defer to Section 75-17-1 and use an 8 percent interest rate. As for chancellor's interest-rate calculation, we agree with Lea's Estate that the chancellor erred by calculating interest based on the total amount of alimony owed (absent the above-discussed credit) between July 2014 and November 2015.

**CONCLUSION**

¶35. Ann's five children almost certainly sought to take away a portion of Susannah's inheritance through the subject probate claim. Specifically, they brought a claim against

16

themselves and Susannah which would financially burden only Susannah. As heirs of both estates, Ann's children would have kicked back to themselves any amount they owed as heirs to Lea's Estate.

¶36. Nevertheless, we hold that Ann's Estate had standing to bring the subject probate claim. The chancery court, however, abused its discretion by denying Lea's Estate credit (1) for the $51,000 in the alimony Lea paid to Ann during 2014 and 2015 and (2) for the $75,143.28 Lea paid to Ann's Estate in 2019. These errors led to both an excessive interest calculation and an inappropriate award of $139,104 to Ann's Estate. Indeed, the $75,143.28 in credit Lea's Estate is entitled to is greater than the $56,056 Lea owed Ann's Estate at the time of his $75,143.28 payment to Ann's Estate in March 2019. Thus, because Lea's Estate does not owe Ann's Estate any unpaid alimony, we reverse the chancery court's order and render judgment in favor of Lea's Estate.

¶37. **REVERSED AND RENDERED.**

**RANDOLPH, C.J., KING AND COLEMAN, P.JJ., MAXWELL, CHAMBERLIN, GRIFFIS, SULLIVAN AND BRANNING, JJ., CONCUR.**